In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3829

GEMA SALVADORI,

*Plaintiff-Appellant,*

*v.*

FRANKLIN SCHOOL DISTRICT, FRANKLIN EDUCATION
ASSOCIATION, WISCONSIN EDUCATION ASSOCIATION
COUNCIL, MARIE GLASGOW, and DONA SCHWICHTENBERG,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 98-C-1256—**J.P. Stadtmueller**, *Chief Judge.*

ARGUED MAY 14, 2002—DECIDED JUNE 14, 2002

Before COFFEY, MANION, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Gema Salvadori, who is originally
from the Philippines, was a science teacher in the Franklin
(Wisconsin) School District from the 1990-91 school year
through the 1997-98 school year when the District decided
not to renew her employment contract. The board took this
step, it says, because Salvadori failed as a teacher. Sal-
vadori saw things differently. She claimed the board (and
the other defendants, who we'll get to) acted because of
ethnic animus, retaliated against her for complaining about
discriminatory practices, and denied her due process to

boot. The district court (Chief Judge J.P. Stadtmueller) granted summary judgment for the defendants, and Salvadori appeals.

Before turning to the facts, we note that, although we view the facts in the light most favorable to Salvadori, her failure to comply with one of the district court's local rules resulted in a more defendant-friendly version of the facts than one might expect. This is so because once the defendants moved for summary judgment, Salvadori was required by Eastern District of Wisconsin Civil Local Rule 56.2 to submit a specific response to the defendants' proposed findings of fact that clearly delineated only those findings to which she asserted the existence of a genuine issue of material fact. The local rule required Salvadori's response to refer to the contested findings by paragraph number and to cite evidentiary materials supporting her claim that a genuine issue of material fact existed. *See* Civ. L.R. 56.2(b)(1).

Salvadori failed to comply with this rule. Her response to the union defendants' proposed findings of fact consisted of a cursory answer to each proposed fact: "admitted," "disputed," "admitted in part and disputed in part," or an objection based on something such as relevance or lack of personal knowledge. None of her responses cited to evidentiary material.

In responding to the School District's proposed findings of fact, Salvadori cited to the record in only 15 of her 306 responses. Even the evidence cited by those 15 responses did not actually contradict the School District's proposed findings of fact. For example, Salvadori "disputed" paragraph 32 of the School District's proposed findings of fact, which stated, "[Assistant Principal] Ms. [Julia] Lyon criticized Ms. Salvadori for insensitively referring to this child as 'the kid with no teeth' in front of the class." Salvadori's response to this proposed finding stated, "Plaintiff

disputes any inference that she was not meeting her essential functions as a teacher." It then cites to Salvadori's proposed additional findings of fact, which in turn cites to a deposition in which Lyon stated that as of May 1995, Salvadori was generally meeting her duties and responsibilities as a middle school science teacher. Obviously, all this rigmarole does not contradict the School District's specific proposed finding that Salvadori referred to a student as "the kid with no teeth." Additionally, of Salvadori's 15 responses that cite to any kind of evidentiary material, 10 repeat verbatim or paraphrase the statement "Plaintiff disputes any inference that she was not meeting her essential functions as a teacher," then cite to the same evidence noted above.

The local rule empowers the district court to conclude that there is no genuine material issue as to any proposed finding of fact to which no response is set out. *See* Civ. L.R. 56.2(e). Because Salvadori did not satisfy the local rule, the district court concluded that the defendants' proposed findings of fact were undisputed. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1994). Therefore, we proceed under the assumption that Salvadori conceded, to a fairly significant degree, the defendants' version of the facts. With that understanding, we move on.

In 1990 Salvadori began teaching at the Franklin School District's Forest Park Middle School. It was her first full-time teaching position. The District has a position description for teachers outlining performance expectations. Among other things, the expectations are that teachers will (1) avoid demeaning criticism of students, (2) maintain a positive rapport with students, teachers, parents, and administrators, and (3) react positively to constructive criticism. During her first year, the School District received several complaints about Salvadori in these areas.

In January 1991 the parents of one of Salvadori's students asked to have their daughter transferred out of her class because the student received low grades and Salvadori's communication with them about the situation was, in the parents' view, rather poor. During the second semester, several other parents asked to have their children transferred out of Salvadori's class because of low grades.[1] Another parent complained because Salvadori punished the entire class for the misconduct of a single student. Additionally, the School District transferred a student out of Salvadori's class because Salvadori berated the girl in front of the entire class for bringing her parents in to see the principal to complain about Salvadori. Salvadori also told the class that this student would no longer be in class because the student thought that all of her problems were Salvadori's fault.

At the end of the 1990-91 school year, Salvadori received a performance evaluation from Julia Lyon, one of the assistant principals at Forest Park. Lyon identified classroom management and rapport with students as two areas in which Salvadori needed improvement.

During the 1991-92 school year, Salvadori made negative comments about some of her students that Principal Denise Bowens felt were detrimental to their learning and inappropriate for the emotional and developmental needs of middle-school-aged children. On one occasion Bowens met with a student who was crying because Salvadori called him "stupid." At the end of the school year Bowens completed Salvadori's evaluation, in which she raised concerns

---

[1] Of course, the giving of "low grades" doesn't necessarily mean that the teacher is not doing the right thing: the grades may be well-deserved. But it is a fact that complaints of this sort were made, and whether they are justified or not is not really our concern.

about Salvadori's classroom management, rapport with students, and responsiveness to supervision and suggestions for improvement. In her performance evaluation for the 1992-93 school year Bowens was critical of Salvadori's communication skills and her apparent distrust of the school's administration.

During the 1994-95 and 1995-1996 school years, the School District continued to receive parent complaints about the manner in which Salvadori graded and returned homework, her communications skills, and her interaction with students. In December 1995 Associate Principal Tom Reinke and Principal Larry Madsen met with Salvadori to discuss these complaints. Their efforts were hampered by Salvadori's refusal to acknowledge the validity of the complaints. Consequently, she refused to make changes in her teaching style, classroom management, or communication methods.

At the end of the 1995-96 school year, the District placed Salvadori on a "plan of assistance," which was designed to improve her performance and not intended to be disciplinary. Salvadori was not the only teacher placed on such a plan—several other Caucasian teachers were also placed on plans of assistance. Salvadori's plan identified five areas for performance improvement: (1) classroom organization, (2) lesson plans, (3) classroom management, (4) acceptance of constructive criticism, and (5) communication skills. Salvadori disagreed with each of the deficiencies identified in the plan and filed a grievance challenging its validity. In response to the grievance, the School District modified her plan of assistance to focus on communication skills and classroom management as key areas in which Salvadori needed to improve. Salvadori did not cooperate with the plan's recommendations. She refused to meet with the administrators who were supposed to observe and evaluate her teaching. By her own admission, Salvadori did not change her performance in response to the plan.

Part of the reason that Salvadori refused to comply with the plan of assistance was that she perceived the plan as "unjustified harassment," an opinion that she stated to Superintendent Marie Glasgow. In response, Glasgow asked Salvadori to meet with her, or with another administrator of Salvadori's choosing, to discuss her harassment allegation. Although Glasgow made several attempts to initiate a meeting, Salvadori refused to meet with her or another administrator. She also failed to use any of the procedures set out in the School District's anti-harassment policy.

In September 1996 Salvadori took her classes to an environmental center. During one of her morning classes, she allowed the students to become scattered along the path to the center, and as a result, students started throwing berries and leaves at each other. To punish them Salvadori took the entire class to Reinke's office. In front of the entire class Salvadori told Reinke that one of the girls had "lambasted" her and that Salvadori would not tolerate this behavior. Salvadori also suggested that the girl be removed from her class, stating that the girl caused all of the problems that Salvadori had managing that class. Salvadori also acknowledged that she had told the girl to "shut up."

Later that afternoon Salvadori had problems with another one of her classes on the way to the environmental center. At the end of the class she sent Reinke a discipline slip stating that a boy in the class had thrown chewed apples at her back and at a condominium complex during the walk to the center. Reinke looked into the incident and determined that Salvadori had written the disciplinary slip without investigation and had disciplined the wrong boy. As a result, Reinke issued Salvadori a written reprimand stating that she had failed to keep control of her classes that day. Salvadori denied that she had done anything wrong.

In January 1997 Reinke received a complaint that Salvadori had referred to her students as "stupid" and "jerks."

A staff member, Barb Gallagher, also complained about the way in which Salvadori had yelled at a child. As in previous years, parents complained about Salvadori's communication skills and her inconsistent discipline. At the end of the 1996-97 school year, Reinke noted in Salvadori's performance evaluation that she had demonstrated a poor ability to build rapport with students and had poor classroom management skills. The school board subsequently renewed her contract but withheld her salary increase based on what it said were her poor classroom management, poor communication skills, and her inability to accept constructive criticism.

The District reassigned Salvadori to Franklin High School for the next academic year, hoping that a transfer would give her a fresh start. Her plan of assistance ended at the time. During the first semester, Salvadori complained to Principal Dona Schwichtenberg about students' behavior toward her in the halls between classes. She claimed that students shouted at her to go back to the middle school or back to the Philippines, called her names, and threw paper balls and other objects at her. She also complained that one student had disturbed her class twice and had referred to Salvadori using the words "bitch" and "fuck." Salvadori also claimed that unidentified students asked her if she was a green-card holder or an illegal alien. Schwichtenberg addressed the students, explaining that this sort of behavior was unacceptable and must stop immediately. She and the associate principals then began monitoring the halls between classes to deter this kind of misconduct and to punish offenders.

Meanwhile, Schwichtenberg also received complaints about Salvadori. The parent of a girl with special education needs observed one of Salvadori's classes and complained afterward about Salvadori's classroom management. Schwichtenberg then began observing Salvadori's classes and later sent a letter explaining concerns about Salvadori's teaching style.

In Salvadori's 1998 performance evaluation, Schwichten-berg stated that she rarely heard Salvadori use positive reinforcement of appropriate behavior. She also stated that Salvadori did not respond well to criticism. When Schwich-tenberg tried to meet with Salvadori to discuss the perfor-mance evaluation, Salvadori refused, choosing instead to submit a rambling written rebuttal in which she denied Schwichtenberg's criticism, compared the administration to a fascist dictatorship and herself to a slave in ancient Egypt, and used the following incendiary language:

> I feel I have been brutalized, something akin to a rape, several times over and yet should a rape victim opens [sic] up her door to let the rapists come in and rape her all over again, this time with her consent? . . .

> This type of legalized and institutionalized plan of harassment should never, never happen in a civilized society and should not be tolerated at all. No decent human being should be subject to this type of BRUTAL-ITY.

In February 1998 the school board considered a recom-mendation from the administration to end Salvadori's employment after the 1997-98 academic year. The recom-mendation, said the administration, was based on Sal-vadori's ineffective teaching strategies, inability to create an atmosphere conducive to learning, lack of professional growth, unwillingness to assist in solving problems, and lack of cooperation with others. The school board held a hearing to consider the recommendation, at which Salvadori was represented by the union, her attorney, and the NAACP. After the hearing, the board voted to end Sal-vadori's employment after the 1997-98 academic year.

While employed by the School District, Salvadori was part of a bargaining unit represented by the Franklin Ed-ucation Association (FEA), an affiliate of the Wisconsin Ed-ucation Association Council (WEAC). The School District

and FEA were parties to collective bargaining agreements during the years that Salvadori was employed by the School District. The FEA filed grievances on Salvadori's behalf when the School District placed her on a plan of assistance and when it decided not to renew her contract. The FEA decided that the grievances lacked sufficient merit to proceed to arbitration. The union also investigated and evaluated the merits of Salvadori's claims of discrimination. Salvadori met with union representative Jim Gibson, who determined that parental complaints referring to her accent were made in regard to students' difficulty in understanding her. He also determined that School District administrators had not singled out Salvadori for discussion of parental complaints, and therefore that the School District's actions were not based on her race. Salvadori also raised concerns to Gibson about discrimination regarding her placement on the plan of assistance. Based on his knowledge of white teachers who had also been placed on such plans, including one who had been placed on a plan at the same time as Salvadori, Gibson did not see a basis for raising discrimination in the grievance that the union submitted on her behalf regarding the plan.

In the summer of 1996, Salvadori asked WEAC to initiate legal action against the School District for alleged discriminatory conduct. WEAC has a legal obligation to represent employees in matters involving bargaining and enforcement of the collective bargaining agreement, but not to pursue individual rights claims arising outside the realm of the collective bargaining agreement. It will, however, consider a request to file individual statutory claims and has represented some employees in such claims if they are highly meritorious. After reviewing documents and interviewing witnesses provided by Salvadori, a WEAC attorney determined that there was insufficient evidence to proceed with an individual discrimination complaint.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions on file, and

affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Vukadinovich v. Board of Sch. Tr. of North Newton Sch. Corp.*, 278 F.3d 693 (7th Cir. 2002). The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. To successfully oppose the motion, the nonmovant must present definite, competent evidence in rebuttal. *See id.* at 699. We have already noted Salvadori's shortcomings in this regard.

If a plaintiff cannot defeat a summary judgment motion based on the strength of her proffered direct evidence, she may use the burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To prevail under this approach, the plaintiff must first establish a prima facie case of discrimination. This requires a showing that (1) the plaintiff was a member of a protected class, (2) the plaintiff was performing her job satisfactorily, (3) the plaintiff suffered an adverse employment action, and (4) similarly situated employees who were not members of the protected class were treated more favorably. If the plaintiff makes the prima facie showing of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decision. If the employer does so, it rebuts the presumption of discrimination, shifting the burden back to the employee to show that the employer's proffered reason was pretextual. *See Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 397-98 (7th Cir. 1997). Despite the burden-shifting approach, the ultimate burden of proof that the defendant discriminated remains at all times with the plaintiff. *See id.* at 398.

Salvadori has no trouble satisfying the first and third elements of this test:  she was born in the Philippines and she was discharged. She has problems, however, showing that she was performing her job satisfactorily. Salvadori points to performance evaluations that she received in

1990-91, 1993, and 1995. The 1990-91 evaluation stated that Salvadori was a "conscientious, reliable, prompt and diligent teacher." The 1993 and 1995 evaluations were less glowing, stating only that she was meeting the essential functions of her job.

Salvadori cannot satisfy the satisfactory performance requirement by showing only that her performance was adequate for some period of time during her employment. She must show that she was performing well at the time of her termination. *See Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993); *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991). By the time the District decided against renewing Salvadori's contract, she had already been placed on a plan of assistance with which she failed to comply and been transferred to the high school where she exhibited the same performance deficiencies she had at the middle school. Thus, she cannot establish that she was performing her job satisfactorily. Therefore, the district court properly found that Salvadori failed to make out a prima facie case of discrimination.

Next, Salvadori argues that the School District deprived her of equal protection by subjecting her to a racially hostile environment and to disparate treatment. To establish an equal protection claim a plaintiff must show that (1) she is a member of a protected class, (2) she was otherwise similarly situated to members of an unprotected class, and (3) she was treated differently than members of the unprotected class. *See McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993).

Salvadori's first argument is that the School District subjected her to a racially hostile work environment by ignoring her complaints that students were harassing her. Salvadori complained in 1993 that middle school students referred to her as "green card." She also argues that the

School District did nothing when it received complaints about her accent in 1995.

A hostile work environment exists where the employee is subject to conduct so severe and pervasive that a reasonable person would find the work environment abusive or hostile. *See Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81 (1998). The mere utterance of a racial epithet that engenders offensive feelings does not sufficiently affect the conditions of employment to create a hostile work environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Here, the isolated offensive comments made in 1993 and 1995 were not severe and pervasive enough to alter the conditions of Salvadori's employment, and so she cannot establish an equal protection claim on this ground.

Salvadori also contends that she was subjected to a hostile work environment because high school students harassed her in the halls between classes. An employer has a duty to take reasonable steps to discover and rectify acts of harassment against its employees. *See Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir. 1995). But in a school situation, especially a high school full of pumped-up teenagers, there are obviously limits on what any administration can do to "control" inappropriate behavior. Nevertheless, after Salvadori complained, Principal Schwichtenberg told students that harassment of Salvadori was unacceptable and must cease immediately. Schwichtenberg and her associate principals then began monitoring the halls to determine who was engaging in the harassment so that they could discipline the offenders. This response was both reasonable and swift. Therefore, Salvadori fails to establish an equal protection claim based on the School District's alleged tepid response to harassment by students at the high school.

Another ground for Salvadori's equal protection claim was the plan of assistance, which she regarded as "unjustified harassment." As we have noted, when Superintendent Glas-

gow learned of Salvadori's concerns, she suggested that Salvadori meet with her or another administrator to discuss the perceived harassment. Salvadori declined to meet with Glasgow or anyone else. Because plaintiffs alleging harassment must reasonably take advantage of any preventive or corrective opportunities that an employer provides, Salvadori cannot establish an equal protection violation based on the plan of assistance. *See Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999); *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1038 (7th Cir. 1998).

Salvadori also claims that the District deprived her of equal protection by treating her differently from other teachers with regard to her attempts to discipline students. Salvadori claims that students whom she sent to the principal's office for discipline were returned to her classroom and that her class contained a number of "difficult" students with learning problems. However, she failed to put forth any evidence regarding why she disciplined the students who were returned to her classroom or why they were sent back. Nor did Salvadori identify a Caucasian teacher whom the administration supported differently in his or her discipline of students. Nor did Salvadori put forth any evidence that her classes contained more students with special needs than the classes of any Caucasian teacher. To survive summary judgment, a plaintiff must point to at least one similarly situated, nonprotected class employee who was treated more favorably than she was. *See Ibarra v. Martin*, 143 F.3d 286, 293 (7th Cir. 1998). Salvadori has failed to show that she was treated differently than Caucasian teachers (male or female) with regard to these issues, and so she cannot establish an equal protection violation.

Her final equal protection claim concerns one of the incidents that occurred during the ill-fated trip to the environmental center. Salvadori's contention concerns the written reprimand she received from (Assistant Principal)

Reinke for poor classroom management. Reinke issued the reprimand after he discovered that Salvadori had punished the wrong boy for throwing apples at her. Salvadori claims that Jane Daly, a Caucasian teacher, was treated differently after students threw objects at her. However, Salvadori failed to put forth any evidence regarding the conduct of Daly's students or how the administration dealt with it. Additionally, Salvadori failed to show that she and Daly were similarly situated because she put forth no evidence that Daly, like Salvadori, disciplined the wrong student. Therefore, because she could not point to preferential treatment of a similarly situated Caucasian teacher, Salvadori failed to establish an equal protection violation.

Finally, Salvadori argues that she put forth sufficient evidence that the union defendants ratified the School District's allegedly discriminatory behavior. A union may not refuse to file race-based, disparate-treatment grievances solely because the union looks with disfavor on those types of claims or because they would be troublesome to process. *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 669 (1987). Here, however, the union defendants investigated Salvadori's claims of racial harassment and disparate treatment and found no basis to support her claims. Therefore, Salvadori cannot establish that the union defendants ratified the School District's allegedly discriminatory behavior.

Chief Judge Stadtmueller's decision to grant summary judgment to these defendants is AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
