Gregory S. FOX, Plaintiff,

v.

LEAR CORPORATION, Defendant.

No. 1:03–cv–00599–TAB–DFH.

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 28, 2004.

Alan L. McLaughlin, Kevin S. Smith, Baker & Daniels, Indianapolis, IN, for Defendant.

Michael Lynn Parkinson, Parkinson Law Firm, Lafayette, IN, for Plaintiff.

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BAKER, United States Magistrate Judge.

### I. Introduction.

Title VII of the Civil Rights Act of 1964 requires employers to make reasonable accommodations for their employees when an employee's bone fide religious practice conflicts with a job requirement. Plaintiff Gregory S. Fox advised his employer, Defendant Lear Corporation, that his religious beliefs prevented him from working on his Sabbath—from sundown Saturday to sundown Sunday. Several discussions and an EEOC charge later, Fox and Lear agreed on an accommodation that would allow Fox to work on weekends when required by Lear but avoid Fox's Sabbath. The accommodation worked for awhile, but due to his desire to work overtime, Fox later insisted that Lear not only accommodate him for those weekends when work was mandatory, but also those weekends in which work was voluntary. This lawsuit followed. As set forth below, the bounds of Title VII do not stretch as far as Fox contends.

### II. Summary Judgment Standard.

■ Summary judgment is proper when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Lucas v. Chicago Transit Authority,* 367 F.3d 714, 720 (7th Cir.2004). At the summary judgment stage, the Court construes all facts and draws all reasonable inferences in the light most favorable to Fox, the nonmoving party. *Davis v. Con–Way Transp. Central Express, Inc.,* 368 F.3d 776, 779 (7th Cir. 2004). However, because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, Fox must respond to Lear's motion with evidence setting forth specific facts showing that there is a genuine issue for trial. *Vukadinovich v. Board of School Trustees of North Newton School Corp.,* 278 F.3d 693, 698 (7th Cir.2002). Fox fails in this respect.

■ In this district, summary judgment procedure is governed by Local Rule 56.1, which states in relevant part that a non-moving party's brief "shall include a section labeled 'Statement of Material Facts in Dispute' *which responds* to the movant's asserted material facts." (emphasis added). S.D. Ind. L.R. 56.1(b). As this Court has held, "[w]hile this does not require a nonmoving party to respond to each and every fact, point by point, it does require that the nonmoving party submit potentially determinative facts and identify factual disputes" that the party contends precludes summary judgment. *Rayl v. Decision One Mortg. Co.,* 2003 WL 21989992, *1 (S.D.Ind.2003). Fox failed to contest Lear's version of the facts. Accordingly, to the extent those facts are supported by admissible evidence, the Court assumes they are admitted. S.D. Ind. L.R. 56.1(e). "[A] lawsuit is not a game of hunt the peanut. Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are 'obliged in our adversary system to scour the record looking for factual disputes ....'" *Greer v. Board of Educ. of City of Chicago, Ill.,* 267 F.3d 723, 727 (7th Cir.2001), *quoting Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921–22 (7th Cir.1994).

## III.  Background.[1]

Fox began working for Lear on June 14, 1996 as a production operator in Lear's Edinburgh, Indiana plant. [Fox Dep., p. 90]. After three months, Fox moved to the maintenance department where he has remained since that time. [Fox Dep., pp. 90–91]. For the past three to four years, Fox has held the skilled position of maintenance journeyman. [Fox Dep., pp. 90–91]. In this position, Fox's responsibilities include supporting the production line by servicing, maintaining and repairing the various machines. [Fox Dep., p. 94]. Fox is one of five second-shift maintenance personnel and the shift's only maintenance journeyman. [Fox Dep., pp. 12, 23].

All of Lear's full-time regular and maintenance employees are represented by the United Auto Workers Local 2401 ("UAW"). [Fox Dep., p. 55; Ex. 4, pp. 1–2]. Although not a member of the UAW, Fox is a member of the collective bargaining unit. [Fox Dep., p. 55]. Accordingly, his employment relationship is governed by the collective bargaining agreement ("CBA") between Lear and the UAW, except for those provisions dealing with membership and membership dues. [Fox Dep., pp. 55–57; Ex. 4].

With respect to second-shift maintenance employees, weekend work arises in one of two ways. First, Lear may schedule mandatory weekends, covering either Saturday or Sunday, or both. When this occurs, it is known as being "scheduled full." [Fox Dep., p. 162; Ex. 4, p. 22]. Second, if a full maintenance crew is not required, Lear may seek volunteers to work. [Fox Dep., pp. 162–63; Ex. 4, pp. 21–22]. The CBA requires Lear to seek volunteers in order of seniority depending on the last person to volunteer. [Fox Dep., p. 163; Ex. 4, p. 22]. If too few maintenance employees volunteer to fill Lear's requirements, Lear drafts employees to fill the remaining slots, beginning with the least senior employee. [Fox Dep., pp. 164–65; Ex. 4, p. 22]. Finally, "[e]mployees will not be required to work more than 2 weekends per month unless their department is scheduled full." [Ex. 4, p. 22].

Fox is a member of the Presbyterian Reformed Church of America. [Fox Dep., p. 99]. His religious beliefs prevent him from performing work on the Sabbath, other than work of mercy or necessity. [Fox Dep., pp. 62–65, 100–102; Ex. 9]. Fox defines the Sabbath as sundown on Saturday through sundown on Sunday. [Fox Dep., pp. 100–102]. Although Fox first informed Lear of his religious convictions on November 5, 1999, he did not formally request relief from Sunday work until January 6, 2000. [Fox Dep., p. 124; Exs. 9–10]. Fox reiterated his request in a letter dated January 28, 2000. [Ex. 12]. In requesting the accommodation, Fox was concerned that if Lear continued to require him to work during the Sabbath, he would follow his convictions and accumulate points under Lear's attendance policy. Ultimately, Fox feared that attendance points would lead to his termination. [Fox Dep., pp. 129–31; Exs. 12].

In response to his accommodation request, Fox met with Lear and UAW representatives on March 10, 2000. [Fox Dep., pp. 133–35]. The UAW attended to ensure that any accommodation complied with the CBA. [Fox Dep., p. 138]. Although different alternatives were discussed, the parties to the meeting could not reach an agreeable solution. [Fox Dep., pp. 135–36; Ex. 14]. Thereafter, on March 28, 2000, Fox filed EEOC charges alleging that Lear

---

1.  The facts are either undisputed or viewed in a light most favorable to the non-moving party. In addition, this background section is a brief overview of the facts and is not meant to be an exhaustive recitation of all material facts in this case.

and the UAW failed to accommodate his religious beliefs. [Fox Dep., pp. 138–39; Ex. 13].

In early May 2000, Lear and UAW representatives again met with Fox to discuss his request for a religious accommodation. [Fox Dep., pp. 154–56; Ex. 16]. At the meeting, C. Von Williamson, Lear's human resources manager, presented Fox with an accommodation proposal that Lear and the UAW believed would satisfy Fox. [Fox Dep., pp. 154–56; Ex. 16]. Williamson also presented the proposal to Fox in a letter dated May 4, 2000. [Fox Dep., pp. 156–57; Ex. 17]. According to the letter:

> The company will not apply the attendance policy as written from Sundown Saturday to Sundown Sunday. The company will adjust [Fox's] starting time for Saturday work to 8.5 hours prior to Sundown on Saturday. For Sunday work the company will adjust [Fox's] starting time to Sundown Sunday and [Fox's] quit time to 8.5 hours past sundown. [Fox's] regular work week will then begin at 3:30 p.m. Mondays.

[Ex. 17]. After discussing the proposal with his attorney, Fox signed the letter as "Received and accepted." [Fox Dep., p. 157; Ex. 17]. In addition, Fox also wrote: "Thank you for accommodating my religious convictions for the hours of second shift. I look forward to working with you to continue to find accommodations for both first and third shift hours. By signing this I do not waive any of my rights." [Ex. 17.].

After agreeing to the accommodation proposal, Fox began working weekends pursuant to the proposal. [Fox Dep., p. 161]. Since May 2000, Lear has always accommodated Fox in instances where Lear mandated weekend work, i.e. full schedule or draft situations. [Fox Dep., pp. 31–32]. However, in late January 2001, a dispute arose concerning whether the May 2000 accommodation applied to instances where Fox could volunteer for weekend work, as opposed to mandatory weekend work. [Fox Dep., pp. 169–79; Ex. 19]. Once again, Fox met with representatives from Lear and the UAW. [Fox Dep., pp. 45, 186–87; Ex. 19]. As a result, Lear confirmed that the May 2000 accommodation applied only to those circumstances in which Lear mandated that Fox work. It did not apply to volunteer weekend work. [Id.]

In response, on February 1, 2001, Fox delivered a letter to Lear's human resources department outlining his understanding of Lear's position. [Fox Dep., pp. 191–92, 197; Ex. 20]. In relevant part, the letter stated:

> If I am to understand this correctly then you're saying our agreement doesn't cover volunteer overtime. My only choices when asked to work overtime would then be to:
>
> ● 1. Volunteer and work from 3:30 p.m. to 12:00 a.m. and compromise my religious beliefs.
>
> ● 2. Volunteer to work from 3:30 p.m. to 12:00 a.m. but leave at sundown and be disciplined for not finishing the shift.
>
> ● 3. Refuse to volunteer every time.

[Ex. 20]. The next day, Williamson confirmed that, with the exception of "quit[ting], or get[ting] another religion," Fox's letter accurately described the three choices he had in such situations. [Fox Dep., p. 198]. As of February 2, 2001, Fox knew that Lear would not apply the May 2000 accommodation arrangement to voluntary weekend situations. Also at that time, Fox believed his Title VII rights were being violated by Lear's failure to do so. [Fox Dep., pp. 200–01].

Fox filed a second EEOC charge on July 5, 2002 alleging that Lear violated his rights under Title VII by refusing to ac-

commodate his religious beliefs to allow Fox to work voluntary overtime. [Fox Dep., p. 216; Ex. 22]. However, Lear has not penalized him for declining voluntary weekend work. [Fox Dep., pp. 16, 166–67].

## IV. Discussion.

As best the Court can discern from his sparse argument, Fox presents two claims in this action. First, Fox argues—without citation to authority—that Lear discriminated against him by refusing to accommodate his religious beliefs in a way that would allow Fox to work voluntary overtime during weekends. In addition, Fox argues—again, without citation to authority—that the May 2000 accommodation provided by Lear applies to both voluntary and mandatory weekends and that Lear somehow breached this contract when it refused to apply the accommodation to voluntary weekends. As explained more fully below, neither of Fox's arguments is compelling.

### A. Title VII Failure to Accommodate Religious Belief.

Lear argues that it is entitled to summary judgment on Fox's Title VII claim because: (1) Fox's EEOC charge was untimely; (2) Fox cannot establish a prima facie case of religious discrimination; and (3) "even if he could ... his ability to decline voluntary weekend work without penalty constitutes a 'reasonable accommodation' and because the only accommodation acceptable to him would pose an undue hardship on Lear." [Docket No. 28, p. 11]. The Court agrees with Lear in each respect.

■ First and foremost, Fox's Title VII claim fails because it is untimely. "In a deferral state, such as Indiana, a charge must be filed within 300 days of the occurrence of the act that is the basis of the complaint." *Doe v. R.R. Donnelley &*

*Sons Co.,* 42 F.3d 439, 445 (7th Cir.1994), *citing* 42 U.S.C. § 2000e–5(e)(1). As illustrated above, as of February 2, 2001, Fox knew that Lear would not apply the May 2000 accommodation arrangement to voluntary weekend situations. In addition, Fox believed at that time that his Title VII rights were being violated by Lear's failure to do so. [Fox Dep., pp. 200–01]. Yet Fox did not file an EEOC charge regarding this matter until July 5, 2002—seventeen months later. During his deposition, Fox gave no explanation for the delay. [Fox Dep., pp. 201, 217].

■ While not argued in his brief, Fox testified that he believed each instance he could have worked voluntary weekend overtime but was unable because of Lear's alleged failure to accommodate constituted a separate violation of Title VII. [Fox Dep., p. 207]. Fox is mistaken. In a relatively recent case, the Second Circuit in *Elmenayer v. ABF Freight System, Inc.,* 318 F.3d 130 (2nd Cir.2003), ruled on this precise issue. In that case, the court explained that:

> [A]n employer's rejection of an employee's proposed accommodation for religious practices does not give rise to a continuing violation. Rather, the rejection is the sort of "discrete act" that must be the subject of a complaint to the EEOC within 300 days. Once the employer has rejected the proposed accommodation, no periodic implementation of that decision occurs, comparable to the weekly cutting of a payroll check in *Bazemore [v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) ]. The rejection of a proposed accommodation is a single completed action when taken, quite unlike the "series of separate acts" that constitute a hostile work environment and "collectively constitute" an unlawful employment practice. *Id.* Although the *effect* of the employer's

rejection continues to be felt by the employee for as long as he remains employed, that continued effect is similar to the continued effect of being denied a promotion or denied a transfer . . . .

*Elmenayer*, 318 F.3d at 134–35. In other words, because Fox did not file an EEOC charge within 300 days after Lear rejected Fox's request for an accommodation, his claim is time-barred.[2]

■ Even overlooking this procedural bar, Fox's Title VII claim fails on the merits. "To make out a prima facie case, a plaintiff must show that '(1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the employer's attention, and (3) the religious practice was the basis for the adverse employment decision.' " *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 478 n. 2 (7th Cir.2001), *quoting EEOC v. United Parcel Serv.*, 94 F.3d 314, 317 (7th Cir.1996). If Fox is able to satisfy the requirements of his prima facie case, "the burden is on the employer to show that a reasonable accommodation of the religious practice was made or that any accommodation would result in undue hardship." *Anderson*, 274 F.3d at 475. However, as explained below, the Court need not reach this step as Fox failed to meet his prima facie burden.

Although the initial burden to present a prima facie case of religious discrimination falls upon Fox, he presents no facts or argument to satisfy this burden. Indeed, Fox does not even mention the prima facie elements in his opposition to summary judgment. In contrast, while assuming that Fox has a sincerely held religious belief that prevents him from working on his Sabbath, Lear maintains that Fox cannot show that his conviction conflicted with

an employment requirement or resulted in an adverse employment action. Lear is correct in both instances.

■ There is no dispute that Fox engaged in a "bona fide religious practice" of declining to work on his Sabbath, i.e. between sundown on Saturday and sundown on Sunday. However, Fox fails to establish the first element of the prima facie case because he cannot show that his practice of not working on his Sabbath conflicts with an employment *requirement*. Voluntary work is exactly that—voluntary. In other words, Lear did not *require* Fox to work during voluntary weekends. Put another way, this is not a situation where Fox had to choose between his religious convictions and the requirements of his job. Instead, Fox's choice was between his religious convictions and additional money, i.e. working voluntary overtime. This is not the type of "conflict" that Title VII was meant to alleviate.

In the seminal case of *Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986), the Supreme Court explained:

[R]equiring respondent to take unpaid leave for holy day observance that exceeded the amount allowed by the collective-bargaining agreement, would generally be a reasonable one. In enacting § 701(j), Congress was understandably motivated by a desire to assure the individual additional opportunity to observe religious practices, but it did not impose a duty on the employer to accommodate at all costs. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). The provision of unpaid leave eliminates the conflict between employment requirements and re-

---

**2.** In *Elmenayer,* the court specifically declined to "decide what the effect would be if the employee renews the request for an accommodation." 318 F.3d at 135. The Court also

declines to make such a determination as Fox has not presented any evidence that additional requests were made beyond February 2, 2001.

ligious practices by allowing the individual to observe fully religious holy days and requires him only to give up compensation for a day that he did not in fact work. Generally speaking, "[t]he direct effect of [unpaid leave] is merely a loss of income for the period the employee is not at work; such an exclusion has no direct effect upon either employment opportunities or job status." *Nashville Gas Co. v. Satty,* 434 U.S. 136, 145, 98 S.Ct. 347, 353, 54 L.Ed.2d 356 (1977). *Ansonia,* 479 U.S. at 70–71, 107 S.Ct. 367. Thus, Fox's ability to decline voluntary weekend work without retribution "eliminates the conflict between employment requirements and religious practices" and satisfies Lear's duty to provide a reasonable accommodation. *Id.* Because there is not a conflict, Lear's duty never materializes.

■ Moreover, even if Fox could meet his prima facie case, Lear satisfied its duty to provide a reasonable accommodation for the same reasons described above, i.e. Fox can decline to work without retribution. As a result, Lear need not show that Fox's proposed alternative accommodation imposes an undue hardship. "The Supreme Court has instructed that 'where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternatives would result in undue hardship.'" *Wright v. Runyon,* 2 F.3d 214, 217 (7th Cir.1993), *quoting Ansonia,* 479 U.S. at 68, 107 S.Ct. 367. Accordingly, Fox's Title VII religious accommodation claim must fail.

## B. Breach of Contract.

Fox also claims that the May 2000 accommodation arrangement formed a binding contract between that parties and covered both voluntary and mandatory weekends. Accordingly, Fox argues, Lear breached the agreement when it refused to extend the accommodation to voluntary weekends.

■ In contrast, Lear argues that "Fox cannot demonstrate the exchange of consideration that would give rise to legally enforceable contract rights." [Docket No. 28, p. 24]. Lear is correct in this regard.

In the instant matter, Fox concedes that in exchange for the accommodation offered by Lear:

- He did not promise to do anything he otherwise would not have done;
- He did not promise to refrain from doing anything that he otherwise would have done;
- He did not pay any money to Lear or provide Lear with any sort of property or goods;
- Lear did not ask him to withdraw his EEOC Charge;
- Lear did not ask him to give up his right to file a lawsuit against Lear;
- He did not promise or agree to give up any rights (and specifically wrote on the written accommodation proposal that he was *not* waiving any rights by signing the proposal); and
- His attorney, thereafter, did *not* contact the EEOC to ask it to withdraw or dismiss his charge against Lear.

[Docket No. 28, pp. 7–8, *citing* Fox Dep., pp. 159–61].

In *Krieg v. Hieber,* 802 N.E.2d 938, 944 n. 3 (Ind.Ct.App.2004), the Indiana Court of Appeals explained:

We have held that "[a]n offer, acceptance, consideration, and a manifestation of mutual assent establish the existence of a contract." The concept of consideration is often encapsulated by the phrase "bargained for exchange." To constitute consideration, the promisor must receive a benefit and the promisee must receive

a detriment. A benefit is a legal right given to the promisor to which the promisor would not otherwise be entitled. Whereas, a detriment is a legal right the promisee has forborne.

Under the facts of this case, the Court cannot find that the requisite consideration existed to form a binding contract between the parties. Accordingly, Fox's breach of contract claim must fail.

## V. Conclusion.

Defendant's motion for summary judgment is granted with respect to all claims. Final judgment shall be entered accordingly. Costs are awarded to the Defendant.