In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1625

Brian Vukadinovich,

Plaintiff-Appellant,

v.

Board of School Trustees of North
Newton School Corporation, Ary J.
Nelson, Bonnie J. Storey, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 00 C 37--Allen Sharp, Judge.

Argued September 10, 2001--Decided January 22, 2002


   Before Posner, Kanne, and Evans, Circuit
Judges.

   Kanne, Circuit Judge.  After the North
Newton School Corporation ("School")
terminated his employment, plaintiff
Brian Vukadinovich brought a lawsuit
against the Board of School Trustees of
the North Newton School Corporation
("School Board") and various school
officials under 42 U.S.C. sec. 1983.
Vukadinovich alleged that the defendants
violated his First Amendment rights by
firing him in retaliation for his
exercise of free speech and that his
termination hearing violated the
Fourteenth Amendment, as it did not
comport with principles of due process.
The district court granted summary
judgment in favor of the defendants,
finding that Vukadinovich was fired for
insubordination and neglect of duty, and
not in retaliation for exercising his
First Amendment rights. The court also
granted summary judgment in favor of the
defendants on Vukadinovich's Fourteenth
Amendment claim, finding that his
termination hearing afforded him due
process. We affirm.

I.  History

A.  Vukadinovich's Dispute with School

On January 9, 1996, the School hired Vukadinovich as a teacher in the Industrial Arts/Technology Department and as the head coach of the boys' basketball team. Shortly before the 1999-2000 school year, Vukadinovich wrote a letter to Superintendent Louis Lindinger complaining about his coaching salary and demanding a renegotiation of his contract. On October 8, 1999, the School presented Vukadinovich with a contract to coach the boys' basketball team at the same salary that he had made the year before. After Vukadinovich refused this offer, the School hired someone else to coach the team at the same salary offered to Vukadinovich.

This course of events spurred Vukadinovich to approach the local media, decrying the manner in which the School and Superintendent Lindinger had treated him. For example, on November 2, 1999, the Rensselaer Republican published a letter written by Vukadinovich, in which he called Superintendent Lindinger a liar, accused him of using "fear and intimidation tactics," and stated that "Lindinger will indeed answer for his lies and refusal to follow the laws." On November 10, 1999, the Newton County Enterprise published a letter written by Vukadinovich, in which he accused Superintendent Lindinger of "ruining the school corporation" and launched personal attacks against him. By December 1999, the scope of Vukadinovich's attacks expanded, as he now accused School Board members of "living high on the hog" and criticized School Board members for spending taxpayer money on business trips. Over the next few months, the local papers continued to publish Vukadinovich's letters, in which he attacked Superintendent Lindinger's high salary and the way that the School Board spent money.

On February 11, 2000, the Newton County Enterprise published a letter from the School Board, in which the School Board responded to Vukadinovich's accusations. The School Board noted that "it was not until Mr. Vukadinovich had a contractual dispute over the boys high school coaching position that he ever had the desire to be an 'educational gadfly' for our community." The School Board's letter also pointed out that Vukadinovich had been involved in similar disputes with

previous employers, had engaged in similar letter writing campaigns, and had filed (and lost) lawsuits after he was discharged.

B.   Vukadinovich's Termination

In December 1999, after Vukadinovich had already written many letters critical of the defendants, Principal John Larson gave him a positive job-performance evaluation. Shortly thereafter, however, technology consultant Dan Grayson informed the School that its Technology Department, which was headed by Vukadinovich, did not meet state qualifications. Grayson issued a report ("Report") suggesting how the School could improve the Department. In response to the Report, on February 8, 2000, Principal Larson directed Vukadinovich to submit his lesson plan book and to identify how it addressed the state qualifications. Principal Larson made an identical directive to the heads of three other departments that also did not meet state qualifications--the Math, Language, and Special Education Departments. The heads of these three departments all promptly complied with Principal Larson's directive.

On February 13, 2000, Vukadinovich responded to Principal Larson's directive by writing him a letter, in which he refused to comply with the "harassing and retaliatory request." On March 9, 2000, Principal Larson issued a second letter directing that Vukadinovich submit his lesson plan to him by 8:00 a.m. on March 13, 2000. In response, Vukadinovich went to Principal Larson's office at 7:45 a.m. on March 13, 2000, but Principal Larson was not there. Assistant Principal Jerry McKim signed an acknowledgment indicating that Vukadinovich had attempted to give his lesson plan book to Principal Larson, but was unable to do so due to Principal Larson's absence.

The next day, Principal Larson wrote a letter to Vukadinovich issuing a third directive to him and reprimanding him for failing to comply with his previous two directives. Principal Larson directed Vukadinovich to submit his lesson plan and identify how it addressed state qualifications by 8:00 a.m. on March 17, 2000. The letter also warned Vukadinovich

that his "failure to comply with this directive [would] be viewed as a willful refusal to comply with the directive, and [would] result in further discipline which could include a recommendation that [his] teaching contract be cancelled for insubordination." Not only did Vukadinovich ignore this directive, but he wrote a letter on March 27, 2000, accusing Principal Larson of "adultery," "womanizing," and "massage parlor visits."

That same day, Vukadinovich entered Principal Larson's office while Principal Larson was meeting with another teacher, David Hayes. Vukadinovich attempted to give Principal Larson his lesson plan book, but because he was meeting with another teacher at the time, Principal Larson told him to either leave the book with him or to copy the book and leave him a copy of it. As Vukadinovich refused to do either of these things, Principal Larson gave him back the lesson plan book.

On March 28, 2000, Principal Larson wrote a letter to Vukadinovich informing him that he was recommending to Superintendent Lindinger that Vukadinovich be suspended with pay for two days for failing to comply with his directives. Principal Larson also issued Vukadinovich a fourth directive requesting that he submit his lesson plan book and identify how it addressed state qualifications by the end of the day. Principal Larson waited in his office until 5:00 p.m. that day, but Vukadinovich never came.

In the March 28 letter, Principal Larson also directed Vukadinovich to submit a weekly progress chart identifying and assessing student projects, the first of which was due on April 10, 2000, ("Additional Directives"). Vukadinovich failed to comply with the Additional Directives; in fact, his only response was to question Principal Larson's authority to issue such directives and to attack Principal Larson's character.

On April 10, 2000, Principal Larson wrote a letter providing Vukadinovich with the legal authority that vested him with the power to issue directives. In addition, he wrote to Vukadinovich: "As you have been told repeatedly, your

refusal to comply with my directives jeopardizes your continued employment and this response does not waive or excuse your refusal to comply with my directives to date." Principal Larson delivered this letter to Vukadinovich by hand in Principal Larson's office. Vukadinovich became loud and unruly and refused to leave Principal Larson's office. At his deposition, Principal Larson described Vukadinovich's behavior at this time as "belligerent" and "abusive," bordering on "threatening."

On April 10, 2000, Superintendent Lindinger placed Vukadinovich on administrative leave with pay. He also directed Vukadinovich to comply with all of Principal Larson's prior directives. Again, Vukadinovich failed to comply. As a consequence of his willful refusal to comply with the directives, on April 20, 2000, Superintendent Lindinger informed Vukadinovich that the School Board would be considering the cancellation of his teaching contract at a termination hearing.

On May 23 and 24, 2000, Vukadinovich's termination hearing was held in front of all of the School Board members. Vukadinovich was represented at the hearing by Arthur Henderlog, Director of the Indiana State Teachers Association UniServe, and was given the opportunity to call and cross-examine witnesses, introduce evidence, and rebut the charges against him. Superintendent Lindinger, Principal Larson, Assistant Superintendent Shari Miller, Sam Hills (computer service technician at the School), Denise Thrasher (teacher at the School), and Vukadinovich testified at the hearing. When asked why he did not comply with the directives, Vukadinovich said that he "had other things to do," that he did not believe that he should have been required to do those things, and that "if [he] would've done those [things] . . . it would've been something else and something else." At the conclusion of the hearing, Superintendent Lindinger recommended that the School Board terminate Vukadinovich's teaching contract.

On May 25, 2000, the School Board voted unanimously to terminate Vukadinovich's employment. The School Board found that Vukadinovich's failure to comply with

Principal Larson's five directives constituted "insubordination" and "neglect of duty." Therefore, it found that the School had "good and just cause" to terminate Vukadinovich's employment. Lastly, the School Board concluded that "the cancellation [of Vukadinovich's employment was] in the best interest of the School Corporation."

C.  Procedural History

On June 22, 2000, Vukadinovich filed a pro se complaint in the Northern District of Indiana against the School, various School Board members, Superintendent Lindinger, and Principal Larson, alleging First and Fourteenth Amendment violations under 42 U.S.C. sec. 1983. On August 11, 2000, Vukadinovich filed a "Verified Petition/Motion for Reinstatement" and a request for an evidentiary hearing, seeking to have the School reinstate him as a teacher. The District Court characterized this motion as a motion for a preliminary injunction and set an evidentiary hearing for October 4, 2000.

At the preliminary injunction hearing, Vukadinovich presented extensive evidentiary materials and called Principal Larson, Assistant Principal McKim, David Hayes, Board Member Ary Nelson, Superintendent Lindinger, and Union President Denise Thrasher as witnesses. Earl Cunningham, an employee of the Michigan City Area Schools and personal friend of both Vukadinovich and of Principal Larson, assisted Vukadinovich at the hearing. However, neither Cunningham nor Vukadinovich testified at the preliminary injunction hearing.

On October 3, 2000, defendants filed a Motion for Summary Judgment. Vukadinovich submitted five affidavits ("Affidavits") with his summary judgment brief that he now claims precluded granting summary judgment. One of the Affidavits was from Earl Cunningham, who stated that Larson had told him in February 2000, that Superintendent Lindinger was placing a lot of pressure on him to "get rid of" Vukadinovich because of his newspaper articles. Another was from Martin Fernandez, who stated that he was employed at the School from 1993 to 2000, that he never maintained a lesson plan book, and that he was never reprimanded

for not doing so.

On February 12, 2001, the district court denied Vukadinovich's request for preliminary injunctive relief and granted the School's Motion for Summary Judgment. The district court admitted the Affidavits into evidence, but questioned why the Cunningham affidavit had not been offered at Vukadinovich's termination hearing nor at the preliminary injunction hearing, given that Cunningham assisted Vukadinovich at the latter hearing. The district court found that Vukadinovich was not fired in retaliation of his speech, and that even assuming that he was, he would have been fired anyway. The district court also found that Vukadinovich's termination hearing did not violate his procedural due process rights. Vukadinovich now appeals the district court's judgment on both of these issues.

II. Analysis

A. Standard of Review

We review a grant of summary judgment de novo, viewing all of the facts and drawing all reasonable inferences therefrom in favor of the nonmoving party. See Cent. States, Southeast & Southwest Areas Pension Fund v. White, 258 F.3d 636, 639 (7th Cir. 2001). Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Cengr v. Fusibond Piping Sys., Inc., 135 F.3d 445, 450 (7th Cir. 1998) (quoting Fed. R. Civ. P. 56(c)). The primary purpose of summary judgment is to dispose of claims that have no factual support, and therefore, the nonmovant must respond with affidavits or otherwise, "setting forth specific facts showing that there is a genuine issue for trial." Albiero v. City of Kankakee, 246 F.3d 927, 928 (7th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)). The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. See Kuchenreuther v. City of Milwaukee, 221 F.3d 967, 973 (7th Cir. 2000). The nonmovant will successfully oppose summary judgment only when it

presents "definite, competent evidence to rebut the motion." EEOC v. Sears, Roebuck & Co., 233 F.3d 432, 437 (7th Cir. 2000) (quotation omitted).

B.  First Amendment Claim

   We apply a three-step analysis in evaluating Vukadinovich's First Amendment retaliation claim under 42 U.S.C. sec. 1983: 1) Was his speech constitutionally protected? 2) If so, were the defendants' actions motivated by his constitutionally protected speech? 3) If Vukadinovich can show that his constitutionally protected speech was a substantial or motivating factor in his termination, can the defendants show that they would have taken the same action in the absence of his exercise of his rights under the First Amendment? See Kuchenreuther, 221 F.3d at 973. If Vukadinovich can establish the first two prongs, the burden shifts to the defendants to prove by a preponderance of the evidence that Vukadinovich would have been terminated regardless of his protected speech. See Garrett v. Barnes, 961 F.2d 629, 632 (7th Cir. 1992). If the defendants carry that burden, Vukadinovich bears the burden of persuasion to show that the defendants' proffered reasons were pretextual and that discrimination was the real reason that the defendants fired him. See King v. Preferred Technical Group, 166 F.3d 887, 893 (7th Cir. 1999). In the summary judgment context, this means that Vukadinovich has to show that a rational finder of fact could infer that the defendants' stated reasons for firing him were lies. See Alexander v. Wisconsin Dep't of Health & Family Servs., 263 F.3d 673, 683 (7th Cir. 2001). Because Vukadinovich cannot show that the defendants' justifications were pretextual, his claim fails.

   Assuming, arguendo, that Vukadinovich could prove the first two prongs, the defendants claim that they fired him for "insubordination" and "neglect of duty" and that the record is replete with evidence supporting their assertion. For example, Vukadinovich failed to comply with Principal Larson's directives. Principal Larson directed Vukadinovich to submit his lesson plan book and identify how it complied with state qualifications five times and also made Additional Directives to him. Vukadinovich refused

to comply with at least three of these directives, made half-hearted attempts to comply with the other two, ignored Principal Larson's Additional Directives, and accused Principal Larson of misconduct. These actions constituted insubordination and we have consistently held that insubordination constitutes a legitimate justification for an adverse employment action. See, e.g., Love v. City of Chicago Bd. of Educ., 241 F.3d 564, 570 (7th Cir. 2001). Therefore, because the defendants have shown that they had legitimate justifications for firing him, the burden shifts to Vukadinovich to show that these justifications were pretextual.

Vukadinovich can show pretext directly, with evidence showing that retaliation was the most likely motive for terminating him. See, e.g., Worth v. Tyer, 2001 WL 1657331, at *12 (7th Cir. Dec. 27, 2001). He can also show pretext indirectly, by showing that the defendants' proffered justifications were not worthy of credence. See id. To show that the defendants' justifications were not worthy of credence, Vukadinovich must show that 1) the defendants' justifications have no basis in fact, 2) the justifications were not the real reason for firing him, or 3) the justifications were insufficient to warrant the termination. See id.

Vukadinovich claims that the Cunningham affidavit shows that retaliation was the most likely motive for terminating him. In that affidavit, Cunningham states that Principal Larson told him in February 2000 that Superintendent Lindinger was placing a lot of pressure on him to "get rid of" Vukadinovich because of his newspaper articles. This affidavit does not show pretext for several reasons. First, it does nothing to weaken the defendants' assertions that they fired Vukadinovich for "insubordination" and "neglect of duty," and as we have previously held, "[p]roof that the defendant was brimming over with unconstitutional wrath is insufficient [to prove retaliation]; rather, the plaintiff must demonstrate that the challenged action would not have occurred but for his constitutionally protected conduct." Love, 241 F.3d at 569 (quotations omitted). Additionally, the fact that in February 2000, Principal

Larson made identical directives to three other teachers offsets any inference that he made directives to Vukadinovich because of his letters to the newspapers.

Vukadinovich also cannot show pretext via the indirect method. The record makes clear that Vukadinovich failed to comply with at least three of Principal Larson's directives and with the Additional Directives, that he attacked Principal Larson's character, and that he behaved in a "belligerent" and "threatening" manner. Therefore, the defendants' assertion that they fired Vukadinovich for "insubordination" and "neglect of duty" has "basis in fact." See Worth, 2001 WL 1657331, at *12. Next, the only evidence that Vukadinovich has presented to show that "insubordination" and "neglect of duty" were not the real reasons for his termination is his own subjective belief, and this is not sufficient. See Johnson v. Univ. of Wisconsin-Eau Claire, 70 F.3d 469, 480 (7th Cir. 1995) (holding that plaintiff's "subjective belief that the action was retaliatory and that the claimed reasons were pretext does not alone create a genuine issue of material fact.").

Finally, "insubordination" has consistently been held to be a sufficient justification for an adverse employment action. See, e.g., Love, 241 F.3d at 570; Kahn v. United States Secretary of Labor, 64 F.3d 271, 279 (7th Cir. 1995). Vukadinovich asserts that the Fernandez affidavit shows that his actions did not warrant termination. In that affidavit, Fernandez only states that he never maintained a lesson plan book while employed at the School and was never reprimanded for not doing so. However, the situation here was different-- Vukadinovich was not fired for failing to maintain a lesson plan book; he was fired for failing to comply with directives. Therefore, Vukadinovich has failed to show that the defendants' justifications were pretextual, and summary judgment was proper.

C.  Fourteenth Amendment Claim

Additionally, Vukadinovich asserts that his termination hearing before the School Board violated his procedural due process rights. The entirety of his argument with respect to this claim is that because his hearing was held in front of the same

School Board members that he criticized in his letters, he was not afforded a hearing before a neutral and impartial arbiter. In order to prevail on this claim, however, Vukadinovich must present substantial evidence that the School Board members acted with actual or potential bias. See Head v. Chicago Sch. Reform Bd. of Trustees, 225 F.3d 794, 804-05 (7th Cir. 2000). He has not done so, and this claim is without merit.

III.  Conclusion

For the foregoing reasons, we AFFIRM.