# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-2775

JOHN A. GAZARKIEWICZ,

*Plaintiff-Appellant,*

*v.*

TOWN OF KINGSFORD HEIGHTS,
INDIANA, KINGSFORD HEIGHTS
TOWN COUNCIL, HARRY MORRISON,
Individually and as Council President
of Town of Kingsford Heights, Indiana, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 02 C 150—**Christopher A. Nuechterlein**, *Magistrate Judge.*

ARGUED DECEMBER 2, 2003—DECIDED MARCH 8, 2004

Before RIPPLE, MANION and DIANE P. WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* On November 28, 2001, the Town Council for the Town of Kingsford Heights, Indiana, voted to remove John A. Gazarkiewicz from his position as a laborer in the Town's Public Utilities Department. As a

result, on February 27, 2002, Mr. Gazarkiewicz initiated this action in the United States District Court for the Northern District of Indiana against the Town of Kingsford Heights and its Town Council; the town council members, individually and in their official capacities; and Ralph Harmon, individually and in his official capacity as Utilities Superintendent of the Town (collectively "defendants"). Pursuant to 42 U.S.C. § 1983, Counts I and V alleged that his discharge violated his federal constitutional rights to free speech and association under the First and Fourteenth Amendments, and Counts III and IV alleged deprivation of his rights to procedural and substantive due process under the Fourteenth Amendment. Count II alleged that his discharge also violated his free-speech rights under the Indiana Constitution, and Count VI alleged the Town refused to pay him vacation pay in violation of Indiana law.

In April of 2003, the parties filed cross-motions for summary judgment. In an order dated May 27, 2003, the district court disposed of all Mr. Gazarkiewicz's claims in favor of the defendants. A final judgment was entered on May 28, 2003; Mr. Gazarkiewicz timely appealed. For the reasons set forth in the following opinion, we affirm in part and reverse in part the judgment of the district court, and we remand the case for further proceedings consistent with this opinion.

# I

# BACKGROUND

## A. Facts

The Town of Kingsford Heights administers its business through its five-person Town Council. Mr. Gazarkiewicz was hired on or about May 13, 2001, by the Town to work in

its Public Utilities Department as a laborer. Also in 2001, the Town hired Ralph Harmon as Superintendent of the Public Utilities Department. Town employees levied numerous complaints regarding Mr. Harmon's performance, and this dissatisfaction with Mr. Harmon was a source of disharmony among town employees.

On October 31, 2001, the Council held a mandatory meeting for all of the town employees. The purpose of the meeting, according to various council members, was to allow the employees to air their grievances. At the meeting, the employees were told, apparently somewhat informally, of a new "grievance procedure." At the least, the employees were told that any future complaints regarding a superior were to be addressed in writing to that employee's supervisor, and any complaints regarding Mr. Harmon were to be made to the Council in writing. *See* Appellees' Br. at 4; Williamson Dep. at 17. The parties dispute what the employees were told regarding speaking publicly about grievances. Two council members, Frank Underwood and Evelyn Ballinger, did not remember any discussion at the meeting regarding public speech. *See* Underwood Dep. at 10; Ballinger Dep. at 17. Ms. Ballinger explained:

> I can't really say that we [the Council] ever told them they couldn't speak anything in public, but the common consensus was "what was said in this room should stay in this room." You know, you don't want all of your business out in the street. So that's basically it.

Ballinger Dep. at 17. A third council member, Kevin Williamson, explained that the employees were told that their "public display" regarding Mr. Harmon's and the Council's incompetence was "going to have to stop." Williamson Dep. at 17. The following addition to the employee handbook occurred as a result of the meeting: "The superintendent must be notified of the complaint by the council and the

superintendent will follow up with a written report of the incident to each council member before the review."

Earlier in October of 2001, Mr. Gazarkiewicz typed a flyer written by Robert Reese, a citizen, but not an employee, of the Town. The flyer, in its final form, read:

WAKE UP CALL
Is He Worth it, Are They Worth It?

I'm a homeowner in the Town of Kingsford Height's and have been for the past 11 years, recently our present Utility Superintendent was suspended with pay for not responding quickly about a hazardous spill involving a leaky transformer.

After the property owners called the Environmental Protection Agency "EPA", the "EPA" in turn told them to call hazmat, this caring Superintendent had the dirt removed and it was tested negative for contamination, shame, shame, shame for the delay.

This Superintendent in the short time of employment here has had numerous complaints filed against him from property owners, nothing done, some serious enough to have him dismissed had it happened at another corporation or factory, he even has had a harassment complaint filed against him in the past from another town employee, still nothing done.

Why would this town employ a person to sit at a desk for 38K a year with no knowledge of utilities and not a person who has 25 years of experience and certified in every aspect of town utilities for roughly the same amount?

Is this what our Government calls "PORK BARREL SPENDING"?

> Our current Town Council Board, which by the way have been appointed by proxy, and not elected by the people should consider what the town can and cannot afford in these times of tradgic events, factory closings, high fuel cost's, and budget cuts nation wide to better serve the people of Kingsford Height's in a more efficient way, and not to just please a few. I ask again to the people of Kingsford Height's, would you rather pay for experienced personel, qualified personel, or inexperienced personel? These decisions made recently will reflect on the decisions made come election day. GOD BLESS AMERICA, GOD BLESS FREE ELECTIONS!

The flyer was signed "Concerned Resident." It was posted at a local grocery store approximately two-and-one-half weeks after the October 31 meeting. The parties agree that Mr. Gazarkiewicz was aware that Reese was going to publish the flyer in some fashion, but Mr. Gazarkiewicz did not assist in its posting.

Upon learning of the flyer, Mr. Harmon immediately removed it and delivered it to the President of the Town Council. On November 28, 2001, the Council considered the flyer "incident." The minutes from that meeting state:

> Harry Morrison then read a letter from John Gazarkiewicz dated 11/21/2001, regarding an apology. The incident involved was discussed and it was the concensus [sic] of all Town Council members that there were major violations of the handbook concerning insubordination and that some sort of action should be taken. Disciplinary options were discussed. Following discussion, the motion to terminate the employment of John Gazarkiewicz for insubordination was made by Frank Underwood, seconded by Evelyn Ballinger. During further discussion, Mr. Gazarkiewicz stated that the Town would be "hearing from his attorney" if he is

terminated. The motion carried 4-1, with Kevin Williamson opposed.

Some time after his employment ceased, Mr. Gazarkiewicz made a demand for vacation pay. The Town denied this demand because Mr. Gazarkiewicz had only worked for the Town from June of 2001 to November of 2001, and it interpreted Town of Kingsford Heights, Ind., Ordinance 2-16-020 to require a year of continuous service, or employment past January 1, in order to make an employee eligible for vacation pay.

## B.  District Court Proceedings

### 1.  Procedural Due Process (Count III), Freedom of Association (Count V) & Defendant Harmon's Liability

The district court first noted that Mr. Gazarkiewicz did not respond to the defendants' motion for summary judgment on his procedural due process claim (Count III), his freedom of association claim (Count V), and all claims against Mr. Harmon in his individual and official capacities. Accordingly, the court granted the defendants' motion for summary judgment on these issues. On this appeal, Mr. Gazarkiewicz does not challenge this portion of the district court's holding.

### 2.  Freedom of Speech (Count I)

Mr. Gazarkiewicz alleged that his First Amendment free-speech rights were violated in two distinct ways. First, he alleged that he was discharged in retaliation for his constitutionally protected speech. Second, he alleged that the "grievance procedure" established at the October 31, 2001 meeting constituted a prior restraint inconsistent with the First Amendment. The district court began with Mr.

Gazarkiewicz's First Amendment retaliation claim and held
that the claim failed all three prongs of the test set out in
*Vukadinovich v. Board of School Trustees of North Newton
School Corp.*, 278 F.3d 693, 699 (7th Cir. 2002). As to the first
element, the court determined that Mr. Gazarkiewicz's
speech[1] was not protected because, although it commented
on a matter of public concern, the government's interest in
efficiency as an employer outweighed Mr. Gazarkiewicz's
interest in commenting on these matters. The court espe-

---

[1] As a threshold matter, the district court rejected the defendants'
contention that Mr. Gazarkiewicz's involvement with the flyer
did not constitute "speech" eligible for First Amendment
protection. *See Fogarty v. Boles*, 121 F.3d 886, 890 (3d Cir. 1997)
(explaining that "speech" is necessary to state a cognizable First
Amendment claim). The court explained that Mr. Gazarkiewicz,
"while not composing the flyer, played a significant role in its
publication. Further, [his] termination for insubordination was
triggered by his involvement with the flyer regardless of whether
Plaintiff composed the flyer or was merely Reese's instrument in
drafting the document." R.47 at 9. The defendants did not object
to this holding in their briefs to this court. In any event, we agree
with the district court that Mr. Gazarkiewicz's participation in the
flyer was sufficient to trigger First Amendment protection. His
participation was not in the nature of a disinterested typist, but
as an aider and abetter. We also agree with the district court that
the defendants certainly perceived him as engaging in speech and
dealt with him on that basis. This is a far cry from a case in which
the plaintiff claims the speech did not actually occur or a case in
which the plaintiff disclaims any involvement in the speech. *See
Barkoo v. Melby*, 901 F.2d 613, 619 (7th Cir. 1990) (holding the
plaintiff's First Amendment retaliation claim was not actionable
to the extent the plaintiff admitted the speech never actually
occurred); *Fogarty*, 121 F.3d at 886-91 (holding the plaintiff's First
Amendment retaliation claim not actionable when the plaintiff's
employer *erroneously* believed the plaintiff contacted the press).

cially was persuaded by the fact that the speech took place at a time of disharmony among town employees.

The district court then held that, even assuming Mr. Gazarkiewicz's speech was protected, his claim failed the second and third prongs of the retaliation analysis. These prongs required Mr. Gazarkiewicz to produce evidence showing that his discharge was motivated by his protected activity and to rebut any neutral reason proffered by the defendants for his discharge. *See Vukadinovich*, 278 F.3d at 699. The court stated that Mr. Gazarkiewicz offered no evidence or analysis on either of these issues. Therefore, under Northern District of Indiana Local Rule 56.1(b), the court was required to accept the facts as provided by the defendants on these issues. The court explained that the defendants' motion alleged that Mr. Gazarkiewicz was fired due to a grudge he held against Mr. Harmon. Further, the court held, "the record is replete with examples of Plaintiff's poor job performance, affording Defendants numerous reasons to terminate Plaintiff apart from his speech." R.47 at 15. Accepting these justifications as true, the court held that Mr. Gazarkiewicz's claim failed the second and third elements of the retaliation test.

The district court next held that the grievance procedure issued by the Town Council did not constitute an unconstitutional prior restraint on employee speech. First, the court explained, the grievance procedure was not a "total ban on employee speech, merely a ban on unfounded criticism outside the Town's chain of command." *Id.* at 20. Therefore, "[b]ecause Plaintiff has given no evidence that a blanket restriction on employee speech even existed," his prior restraint claim should fail on this ground alone. *Id.* at 21. Second, the court held that, even assuming the grievance procedure constituted a blanket ban, the Town's interest in preventing further employee disruption by restraining the

speech outweighed Mr. Gazarkiewicz's interest in publicly complaining about town management.[2] Therefore, the court held, Mr. Gazarkiewicz's prior restraint claim must be dismissed.

### 3. Substantive Due Process (Count IV)

The court next held that Mr. Gazarkiewicz's substantive due process claim was not actionable because he had failed to show the defendants' actions in discharging him were so arbitrary and capricious as to "shock[] the conscience." *Id.* at 22 (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 855 (1998)). The court further noted that the defendants had provided several reasons for Mr. Gazarkiewicz's termination, such as insubordination. This doomed his claim, according to the court, because he failed to show that the termination was "unjustifiable by *any* governmental interest." *Id.* at 23 (quoting *Lewis,* 523 U.S. at 849).

### 4. Vacation Pay (Count VI)

Finally, the district court dismissed Mr. Gazarkiewicz's state-law claim for vacation pay. The court noted that Indiana law establishes that an employee is entitled to vacation pay after termination only if he was otherwise entitled to it under the employer's policy at the time of his termination. R.47 at 24-25 (discussing *Damon Corp. v. Estes,* 750 N.E.2d 891, 892-93 (Ind. Ct. App. 2001)). The court then determined that, under Town of Kingsford Heights, Ind., Ordinance 2-16-020, Mr. Gazarkiewicz was not eligible for

---

[2] Having found that Mr. Gazarkiewicz's First Amendment claims failed as a matter of law, the court also dismissed his state free-speech claim under the Indiana Constitution.

vacation pay at the time of his discharge. Therefore, his claim for vacation pay must fail.

## II
## DISCUSSION

### A.  Standard of Review

This court reviews a district court's grant of a motion or cross-motion for summary judgment de novo. *See Allen v. City of Chicago*, 351 F.3d 306, 311 (7th Cir. 2003). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering cross-motions for summary judgment, we are obliged to view all facts and draw all reasonable inferences in a light most favorable to the party against whom the motion under consideration is made. *See Allen*, 351 F.3d at 311.

### B.  Freedom of Speech (Count I)

We first shall address Mr. Gazarkiewicz's claim that he was fired in retaliation for protected speech. The district court determined that this claim failed as a matter of law. We respectfully disagree and now hold that the record establishes that Mr. Gazarkiewicz was fired in retaliation for constitutionally protected speech in violation of the First

and Fourteenth Amendments and 42 U.S.C. § 1983.[3]

A public employee retains First Amendment rights to free speech, including the right to criticize his employer. *See Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1016 (7th Cir. 1997) ("Public criticism of a government employer's policies can be protected speech."). However, that right is not absolute; it must be weighed against the government's need as an employer to conduct its affairs effectively and efficiently. *See Waters v. Churchill*, 511 U.S. 661, 675 (1994). We conduct a three-part inquiry when faced with a claim that a public employee has been improperly retaliated against due to the exercise of his First Amendment rights:

> 1) Was [the plaintiff's] speech constitutionally pro-tected? 2) If so, were the defendants' actions motivated by his constitutionally protected speech? 3) If [the plaintiff] can show that his constitutionally protected speech was a substantial or motivating factor in his termination, can the defendants show that they would have taken the same action in the absence of his exercise of his rights under the First Amendment? If [the plaintiff] can establish the first two prongs, the burden shifts to the defendants to prove by a preponderance of the evidence that [the plaintiff] would have been terminated regardless of his protected speech. If the defendants carry that burden, [the plaintiff] bears the burden of persuasion to show that the defendants' proffered reasons were pretextual and that discrimination was the real reason that the defendants fired him.

---

[3] Because of this disposition, we need not reach Mr. Gazarkiewicz's contention that the "grievance procedure" constituted a prior restraint inconsistent with the First Amend-ment or his claim that his rights to substantive due process under the Fourteenth Amendment were violated.

*Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citations omitted). In this case, the record compels a holding that Mr. Gazarkiewicz's speech was protected and that his discharge was motivated in substantial part by his protected speech.

## 1. Step 1: Constitutionally Protected Speech

"[D]etermining whether the plaintiff's speech was constitutionally protected . . . is a question of law for the court." *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999). The Supreme Court's decisions in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983), establish a two-part inquiry to determine if speech is constitutionally protected. *See generally Wainscott v. Henry*, 315 F.3d 844, 848 (7th Cir. 2003). First, we must determine whether the employee spoke as a citizen upon matters of public concern. *See id.* If this hurdle is cleared, then we must balance "the employee's interest in commenting upon such matters and the employer's interest in efficient public services." *Id.*

## a. Matters of Public Concern

Speech is a matter of public concern if it relates to any matter of "political, social, or other concern to the community." *Id.* at 849 (internal quotation and citation omitted). Conversely, speech is not a matter of public concern if it involves a "personal grievance of interest only to the employee." *Id.* We conduct this inquiry through a consideration of "the content, form, and context of [the speech] as revealed by the whole record." *Connick*, 461 U.S. at 147-48. While due consideration must be given to all of these factors, content is the most important. *See Wainscott*, 315 F.3d at 850.

This case presents a paradigmatic example of speech of a public concern. The content of the flyer, which constitutes Mr. Gazarkiewicz's speech, highlights the mismanagement of a town official, questions the Council's decision to hire an official with inadequate experience and asks whether his salary is justified in light of the difficulties facing the Town. As we recently said in *Wainscott*:

> Whether the city is run in an efficient and effective manner is clearly an important matter of public concern. An employee's ability to highlight the misuse of public funds or breaches of public trust is a critical weapon in the fight against government corruption and inefficiency. *See, e.g., Propst v. Bitzer*, 39 F.3d 148, 152 (7th Cir. 1994); *Conner v. Reinhard*, 847 F.2d 384, 390-91 (7th Cir. 1988). We would be remiss not to protect an employee's ability to expose such things. In addition, most people would likely have an interest in the possible incompetence of public officials. "Speech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests." *Conaway v. Smith*, 853 F.2d 789, 797 (10th Cir. 1988). If the administration was truly running the city in a highly inefficient manner, it would constitute a "'breach of public trust' which the Court in *Connick* suggested might qualify for protection." *Breuer v. Hart*, 909 F.2d 1035, 1038 (7th Cir. 1990).

315 F.3d at 849. Furthermore, the flyer relates those inefficiencies to a matter at the core of our constitutional system: democratic elections. *See Zorzi v. County of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994) ("[P]olitical speech is clearly a matter of public concern . . . ."). The flyer notes that the Town Council was appointed and not publicly elected and warns that, when the council members do come up for elections, these decisions will be taken into account. To be sure, the

flyer was not written in the finest Shakespearian prose, and it did not uncover publicly concealed secrets that would shake the Town's foundations. For good reason, however, these are not prerequisites to First Amendment protection. *See Wainscott*, 315 F.3d at 849 (noting that it is irrelevant, for purposes of the First Amendment analysis, that the plaintiff "did not apprise his audience of shocking revelations or insightful analysis as to why the administration is incompetent"); *Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir. 1996) (explaining that matters of public concern do not necessarily involve matters of "transcendent importance, such as the origins of the universe or the merits of constitutional monarchy").

The defendants argue that, even if the content of Mr. Gazarkiewicz's speech does contain matters of "public importance," it is not a "matter of public concern" because it was motivated by Mr. Gazarkiewicz's personal interests. *See Kokkinis*, 185 F.3d at 844 (holding that, even if speech addresses a matter of "public importance," it may nevertheless be deemed not of "public concern" if the point of the speech was to "further some purely private interest" (internal quotation and citation omitted)). This argument faces a high evidentiary burden as we have emphasized that speech of public importance is only transformed into a matter of private concern when it is motivated *solely* by the speaker's personal interests. *See Gustafson v. Jones*, 290 F.3d 895, 908 (7th Cir. 2002) (emphasizing that speech is transformed into a matter of private interest when it is "only motivated by private concerns" and further explaining that "even if [the police officers] were advancing some private interests when they raised concerns about [the Field Deputy Inspector's] orders, their claim survives as long as they also intended to bring to light what they believed to be the negative law enforcement consequences of the new policy").

The defendants characterize Mr. Gazarkiewicz's involvement with the flyer as merely an attempt to spread rumors about Mr. Harmon and the Council, motivated by Mr. Gazarkiewicz's personal animus against Mr. Harmon and the Council. The defendants claim that the two specific incidents regarding Mr. Harmon that the flyer discusses—the transformer leak and the sexual harassment claim—already had been addressed at a public council meeting and were found to be unsubstantiated by the Council. At the outset, we note the inconsistency of the defendants' reasoning with basic First Amendment principles. The defendants' reasoning implies that, because these two incidents were publicly discussed, they do not need to be brought further to the public's attention. However, employees that highlight publicly known inefficiencies in a call for democratic change implicate First Amendment values to the same extent as whistleblowers who expose those inefficiencies in the first instance. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (discussing the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"). As to the validity of the two specific claims against Mr. Harmon discussed in the flyer, "[a] public employee is not required to prove the truth of his speech in order to secure the protections of the First Amendment." *Chappel v. Montgomery County Fire Prot. Dist. No. 1*, 131 F.3d 564, 576 (6th Cir. 1997). Rather, speech of public importance only loses its First Amendment protection if the public employee knew it was false or made it in reckless disregard of the truth. *See Pickering*, 391 U.S. at 574 ("[A]bsent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on

issues of public importance may not furnish the basis for his dismissal from public employment." (footnote omitted)); *Brenner v. Brown*, 36 F.3d 18, 20 (7th Cir. 1994) ("[A]n employee's speech is not protected where it is . . . made with a reckless disregard for the truth, or is otherwise profane and disparaging."). In this case, the defendants, who carry the burden on this issue, do not even attempt to prove Mr. Gazarkiewicz participated in the flyer knowing the falsity of the two claims against Mr. Harmon or in reckless disregard of their truth. *See Chappel*, 131 F.3d at 576 ("[A]lthough protection may not be available when a public employee knowingly or recklessly makes false statements, it is the defendants' burden to establish that [the public employee] knew or was recklessly indifferent to the fact that his speech was false.").[4]

The content of the flyer, viewed as a whole, is about much more than the two incidents related to Mr. Harmon on which the defendants narrowly focus. *See Taylor v. Carmouche*, 214 F.3d 788, 792 (7th Cir. 2000) (noting that a court is required to view the speech as a whole in determining whether it addresses a matter of public concern). The content of the flyer also goes well beyond matters of personal interest to Mr. Gazarkiewicz as a town employee and addresses matters that affect Mr. Gazarkiewicz as a town citizen. *See Wainscott*, 315 F.3d at 850 ("Wainscott's expression did not concern the effect the city's alleged incompetence had upon him personally. . . . [O]ther than his interest as a taxpayer, he had no personal or pecuniary interest in the placement of dumpsters, or for that matter, in

---

[4] The defendants did not make this claim either before the district court or this court. Therefore, there was no occasion for the district court to reach the issue, and there is no occasion for this court to reach the issue.

the management of the city as a whole."); *cf. Wallscetti v. Fox*, 258 F.3d 662, 667 (7th Cir. 2001) (holding speech addressed only matters of personal interest when "[t]he content of Wallscetti's complaints shows that she was complaining only about Fox and Laraia's [her supervisors] hostility toward her personally, rather than more generally about her supervisors' effect on the morale of the office as a whole or some other issue of broader importance"). Further-more, the additional two factors we are compelled to consider—the form and context of the speech—do not support the conclusion that Mr. Gazarkiewicz was merely rumor-spreading out of personal animus. That the speech came in the form of a flyer signed "Concerned Resident," was developed in conjunction with a town resident and non-employee of the Town and was posted at a local grocery store lends credence to the view that the speech was motivated by public concerns. *Cf. Wallscetti*, 258 F.3d at 667 ("The form of Wallscetti's speech, contacting her supervi-sors' internal superiors rather than attempting to bring the harassment into view of those outside the County's admin-istrative structure, further supports finding that her com-plaints are not protected.").

A fair reading of the record does reveal that Mr. Gazarkiewicz did not think highly of Mr. Harmon or of the Council, and we do not ignore the possibility that his participation in the flyer was motivated in part by that distaste. However, as we recently explained, "to use the nature of this relationship as the basis for the conclusion that this was a statement of personal interest is highly tenuous. An employee's speech on matters that might otherwise be protected cannot lose protection solely as a result of a history of animosity." *Wainscott*, 315 F.3d at 850. In sum, therefore, we agree with the district court that Mr. Gazarkiewicz's speech addressed matters of public concern and was not motivated solely by personal interests.

### b. Balancing of Interests

Even if an employee's speech addresses matters of public concern, it may be punished by the employer if the employer "can carry its burden of proving that the interest of the public employee as a citizen in commenting on the matter is outweighed by the interest of the [government], as employer, in promoting effective and efficient public service." *Gustafson*, 290 F.3d at 909. This court has set forth seven interrelated elements for consideration in our balancing:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000). Upon consideration of these factors in relation to the record before us, we must disagree with the district court's determination that the interest of the community in the orderly processes of government as employer outweighed the right of Mr. Gazarkiewicz to collaborate with his fellow citizen in stating his views on matters of public concern.

Mr. Gazarkiewicz was a laborer in the Town's Public Utilities Department. His position is not one in which "personal confidence and loyalty are necessary," and there is no evidence that his speech affected, much less "impeded," his "ability to perform [his] responsibilities." *Id.*

Moreover, when Mr. Gazarkiewicz participated in the speech, he was acting as "a member of the general public" in a "time, place and manner" implicating less employment-related concerns. *Id.* As alluded to earlier, he was collaborating with a fellow citizen and non-employee of the Town regarding matters which ran more to his interests as a town taxpayer than his interests as a town employee. Further, Mr. Gazarkiewicz's part of the collaboration in forming the flyer took place on his own time and away from work premises, and, when the flyer was actually posted, it was done so off work premises at a local grocery store. *See Connick*, 461 U.S. at 153 & n.13 (explaining the fact that the employee "exercised her rights to speech at the office supports Connick's fears that the functioning of his office was endangered" and further noting that "[e]mployee speech which transpires entirely on the employee's own time, and in nonwork areas of the office, bring different factors into the *Pickering* calculus"). In sum, Mr. Gazarkiewicz was speaking more from the perspective of a town citizen, in his free time, off work premises and, as we held in the previous section, on matters of quintessential public importance. Taken together, these factors dictate that Mr. Gazarkiewicz's speech interest was strong, and "[t]he stronger the employee's interest in speaking, the more substantial a showing the [government] must make to justify its restriction of that speech." *Gustafson*, 290 F.3d at 909.

The defendants have produced no evidence that Mr. Gazarkiewicz's speech actually disrupted town affairs. Of course, the defendants are not required to produce actual evidence of disruption to prevail. The Supreme Court has instructed that we give "substantial weight to government employers' reasonable predictions of disruption," and that we are to look at the facts "as the employer *reasonably* found them to be," and not as the employee claims they occurred.

*Waters v. Churchill*, 511 U.S. 661, 673, 677 (1994). However, to be "reasonable," that prediction must be supported with an evidentiary foundation and be more than mere speculation. *See Wainscott*, 315 F.3d at 851.

The defendants' prediction of disruption in this case is supported too thinly to be deemed anything other than speculation. The defendants contend that they were forced to curtail public criticism of the Council and Mr. Harmon, such as Mr. Gazarkiewicz's, in order to bring under control the disharmony among town employees that was affecting the Town's administration of business. This general disharmony continuously is noted in the defendants' argument, but it is detailed insufficiently in the record for us to conclude its potential to disrupt town affairs. The record in no way quantifies that disharmony, and more importantly, it contains not a single instance of how town administration was disrupted due to this disharmony. The defendants rely heavily, as did the district court, on council member Frank Underwood's testimony that "ever since I took seat we've been dealing over half of our issues were from employees." Underwood Dep. at 7. This statement, and other similar statements we have located in the record,[5] merely supports that the council members had to work harder to address employee concerns; it is insufficient evidence to allow us to

_____

[5] *See* Underwood Dep. at 21 ("[E]ver since I've been on the board we've been dealing with employee issues over—I mean every meeting, and we were getting nowhere."); Underwood Dep. at 22 (noting that the Council had to deal with "accusations" against Mr. Harmon "day in, day out"); Willis Dep. at 15 ("I know there was a lot of turmoil. . . . [W]hen I first got back out there and I just wanted very much to see that curbed and to try it to be a functioning group, you know, instead of a divisive bunch, that's what was happening. It was just a lot of talk and, you know, stuff, and we didn't need that.").

leap to the conclusion that public speech like Mr. Gazarkiewicz's was reasonably likely to cause the Town's functioning to be disrupted. We are not unsympathetic to the importance of workplace harmony and of the need for an employer such as the government to be proactive in solving workplace problems. As we recently said, "[a] government employer need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.' " *Greer*, 212 F.3d at 372 (quoting *Connick*, 461 U.S. at 152). However, all workplaces contain some disharmony, and dissatisfaction with superiors is not uncommon. If a general claim of disharmony could be used by a government to insulate itself from public criticism by its employees, the First Amendment's guarantee that "[e]mployees of governmental entities generally should be able to complain or criticize" in order to promote governmental efficiency would be empty. *Wainscott*, 315 F.3d at 852; *see also Hulbert v. Wilhelm*, 120 F.3d 648, 655 (7th Cir. 1997) ("*Connick* reiterated *Pickering*'s rule that the mere incantation of the phrase 'internal harmony in the workplace' is not enough to carry the day . . . ."). There must be a sufficient evidentiary basis from which we reasonably can conclude that the morale problem, if festered by the public criticism, would cause a serious disruption in municipal services in this area of town governance. That danger, moreover, must be sufficiently severe and imminent to override Mr. Gazarkiewicz's substantial interest in speech. The record simply will not support that conclusion. Therefore, we must hold that the defendants' speculative interests in efficiency are outweighed by Mr. Gazarkiewicz's right to collaborate with a fellow citizen to speak on matters of public concern.

### 2.  Steps 2 & 3: Protected Speech as a Substantial or Motivating Factor in the Discharge

Having determined that Mr. Gazarkiewicz's speech was protected, we now must consider whether his protected speech was the motivation for his termination. Our case law establishes a road map to guide this fact-specific inquiry. First, Mr. Gazarkiewicz bears the burden of showing that his speech was "a substantial or motivating factor in his termination." *Vukadinovich*, 278 F.3d at 699. If he meets that burden, the defendants then must establish "by a preponderance of the evidence that [Mr. Gazarkiewicz] would have been terminated regardless of his protected speech." *Id.* Finally, if the defendants carry that burden, Mr. Gazarkiewicz "bears the burden of persuasion to show that the defendants' proffered reasons were pretextual and that discrimination was the real reason that the defendants fired him." *Id.*

The record in this case makes clear that Mr. Gazarkiewicz's speech was "a substantial or motivating factor in his termination." *Id.* The minutes from the November 28, 2001 council meeting in which Mr. Gazarkiewicz was fired, standing alone, make this abundantly clear:

> Harry Morrison then read a letter from John Gazarkiewicz dated 11/21/2001, regarding an apology. The incident involved was discussed and it was the concensus [sic] of all Town Council members that there were major violations of the handbook concerning insubordination and that some sort of action should be taken. Disciplinary options were discussed. Following discussion, the motion to terminate the employment of John Gazarkiewicz for insubordination was made by Frank Underwood, seconded by Evelyn Ballinger. During further discussion, Mr. Gazarkiewicz stated that the Town would be "hearing from his attorney" if he is terminated. The motion carried 4-1, with Kevin William-

son opposed.

We give these meeting minutes substantial weight; they are contemporaneous, official notations regarding council action. *See Brademas v. St. Joseph County Comm'rs*, 621 N.E.2d 1133, 1137 (Ind. Ct. App. 1993) ("Boards and commissions speak or act officially only through the minutes and records made at duly organized meetings."). Furthermore, they are more reliable than post hoc justifications given by the council members in deposition testimony once they are aware they are being sued. *Cf. Highway J Citizens Group v. Mineta*, 349 F.3d 938, 958 (7th Cir. 2003) ("The purpose of confining judicial review to the administrative record is to ensure that agencies adequately evaluate their proposed course of action *before* they act and do not simply attempt to justify rash, uniformed actions through *post hoc* rationalizations once they are aware they are being sued" (internal quotations and citations omitted)).

The burden now shifts to the defendants "to prove by a preponderance of the evidence that [Mr. Gazarkiewicz] would have been terminated regardless of his protected speech." *Vukadinovich*, 278 F.3d at 699. The defendants argue, and the district court found,[6] that Mr. Gazarkiewicz

---

[6] The district court held: "Plaintiff's motion failed to address" this portion of the First Amendment analysis; therefore, "[u]nder N.D.L.R. 56.1(b) this Court accordingly accepts the facts as provided by Defendants on these matters." R.47 at 15 n.3. At the time of the district court's disposition, the Northern District of Indiana's Local Rule 56.1(b) stated: "[T]he court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the 'Statement of Genuine Issues' filed." Mr. Gazarkiewicz's summary judgment

(continued...)

was fired for insubordination and/or for his poor work performance. As to insubordination, we find ample record evidence to support the proposition that Mr. Gazarkiewicz was fired for "insubordination." Indeed, the meeting minutes cite "insubordination" as the reason for his discharge. However, the minutes, as well as the deposition testimony,[7] make clear that Mr. Gazarkiewicz's speech—the

---

[6] (...continued)
memorandum does not have a section specifically addressing the last two prongs of the retaliation analysis. However, Mr. Gazarkiewicz specifically stated in his "Statement of Material Facts," which we construe to be the same as the "Statement of Genuine Issues" contemplated by N.D. Ind. Local R. 56.1(b), that his "employment was terminated for alleged insubordination because he did not follow th[e] directive." Plaintiff's Rule 56.1(b) Statement ¶ 3. It continues: "The charge of insubordination was based on his willful assistance to another Town resident in the preparation and dissemination of a Flier critical of the Superintendent and the Council." *Id.* ¶ 4. He supported these contentions with multiple citations to the record. Moreover, the district court had before it the minutes from the November 28, 2001 meeting, as well as the other circumstantial evidence, which, taken together, conclusively establishes that Mr. Gazarkiewicz was fired, in substantial part, due to the flyer. Indeed, the district court noted earlier in its opinion that Mr. Gazarkiewicz's "termination for insubordination was triggered by his involvement with the flyer regardless of whether Plaintiff composed the flyer or was merely Reese's instrument in drafting the document." R.47 at 9.

[7] For example, the defendants rely on the testimony of council member Harry Morrison. A critical portion of his testimony reads:

    Q:—is that what you're saying? What do you see as the

(continued...)

flyer—was a major part of that "insubordination." The defendants attempt to cast his insubordination as less about the flyer and more about a "bad attitude" or a "grudge" against Mr. Harmon. However, much of the testimony they rely on again equates a "bad attitude" with Mr. Gazarkiewicz's protected speech. *See, e.g.*, Underwood Dep. at 21 ("[T]his happened roughly about one to two weeks right after that meeting. And I—I made up my mind that, you know, John Gazarkiewicz should be terminated . . . to me it was like defiance, like he didn't want to cooperate."). Other parts of the testimony on which the defendants rely equates a "bad attitude" with Mr. Gazarkiewicz's unobjec-

---

[7] (...continued)
insubordination?

A: He didn't follow the chain of command. There was a complaint that he had which should have been aired out at the meeting.

Q: And the complaint being the issues that are in the flyer?

A: Right . . . .

Morrison Dep. at 23-24. We note that the form or manner of Mr. Gazarkiewicz's speech—posting a flyer at a local grocery store without going through the internal structure—is just as much a part of his protected "speech" as the content of that "speech." That is why we conduct the inquiry into whether speech addresses a matter of public concern with a consideration of the "content, *form, and context* of [the speech], as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)(emphasis added). That is also why, when balancing the parties' respective interests, we take account of the "context" and "time, place and manner" of the speech. *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000). Therefore, to the extent Mr. Gazarkiewicz was fired for not just the content but also the form and manner of his speech, he still was fired for his constitutionally protected speech.

tionable posture of standing on his rights at the council meeting in which he was fired and not being sufficiently apologetic for his protected speech. *See* Morrison Dep. at 24 (noting that he met with Mr. Gazarkiewicz personally and Mr. Gazarkiewicz stated that he didn't have a problem with the Council but "acted like he still had issues with Mr. Harmon and all"). To the extent the defendants imply that *prior instances* of bad attitude led to his firing, their evidentiary support of such prior instances is not strong. Regardless, the record as a whole leads to the unmistakable conclusion that the "insubordination" for which Mr. Gazarkiewicz was fired relates primarily to the flyer "incident"; any concerns of a prior "bad attitude" were secondary.[8] *See* Ballinger Dep. at 25.

As to poor job performance, we agree with the district court that the instances of poor job performance in the record "afford[ed] Defendants numerous reasons to terminate Plaintiff apart from his speech." R.47 at 15 (citing Gazarkiewicz Dep. at 17; Harmon Dep. at 33, 35; Willis Dep. at 13). However, the question is not whether Mr.

---

[8] To support this argument, the defendants advance the contention that "[i]n his deposition, Gazarkiewicz claims that the Town Council had not even read the flyer at the time they decided to terminate his employment. [citing Gazarkiewicz Dep. at 42]. The contents of the flyer were not even at issue." Appellees' Br. at 19. Mr. Gazarkiewicz's testimony actually states that "at the meeting" the council members "[t]alked about the letter, [but] they never read it though, all they read was the apology one." Gazarkiewicz Dep. at 42. Further, the meeting minutes and other deposition testimony conclusively reveal that the Council was aware of the flyer's contents, and the manner of its posting, and were acting on the flyer at the meeting in which Mr. Gazarkiewicz was fired. *See* Harmon Dep. at 27 ("I sent a copy [of the flyer] to the council. The council all received a copy of it.").

Gazarkiewicz *could have been discharged* for his job perfor-
mance, but it is whether he *was in fact discharged* for his job
performance. The issue is one of causation, not of hypotheti-
cal justification. *See Vukadinovich*, 278 F.3d at 699. The
overwhelming weight of the evidence supports the determi-
nation that Mr. Gazarkiewicz's termination had very little to
do with job performance and everything to do with his
speech. The minutes, which, again, we accord great weight,
are silent regarding his job performance. The deposition
testimony also does not advance the defendants' position;
one council member said she cannot remember being
informed of any of Mr. Gazarkiewicz's prior poor work
conduct. *See* Ballinger Dep. at 25. Finally, we cannot ignore
that Mr. Gazarkiewicz's discharge took place contemporane-
ously with his speech, not any instances of poor job perfor-
mance.

Because of this evidence, we must conclude that the
defendants have not met their burden of proving "by a
preponderance of the evidence that [Mr. Gazarkiewicz]
would have been terminated regardless of his protected
speech." *Vukadinovich*, 278 F.3d at 699. Even if they had, the
same evidence discussed above would compel us to con-
clude that Mr. Gazarkiewicz had met his burden of showing
that the "defendants' proffered reasons were pretextual." *Id.*
Mr. Gazarkiewicz collaborated with his fellow citizen in
producing a flyer that constituted constitutionally protected
speech. He was then fired for that speech. Because his First
Amendment rights were violated, we must reverse the
judgment of the district court on Mr. Gazarkiewicz's First
Amendment retaliation claim.

### C. Vacation Pay (Count VI)

The only other question that requires our disposition on this appeal concerns Mr. Gazarkiewicz's claim for vacation pay, which he alleges he earned during his employment but which the Town refused to pay to him after his discharge. The district court determined that Mr. Gazarkiewicz was not entitled to vacation pay. We agree.

Recent Indiana cases interpreting Ind. Code § 22-2-5-1, Indiana's "Wage Payment Statute,"[9] clarify that an employee is entitled to vacation pay upon termination only if his right to vacation pay had vested at the time of his termination. *See Indiana Heart Assocs., P.C. v. Bahamonde,* 714

---

[9] The Indiana Court of Appeals court recently explained:

> Indiana Code § 22-2-5-1, sometimes referred to as the Wage Payment Statute, contains three distinct regulations: "(1) employee's wages must be paid in money; (2) if requested, employers must pay employees semi-monthly or bi-weekly; and (3) *employees, upon separation from employment, must be paid the amount due them at their next and usual payday* (unless their whereabouts are unknown)." *Huff v. Biomet, Inc.,* 654 N.E.2d 830, 835 (Ind. Ct. App. 1995) (footnote omitted, emphasis added).

*Indiana Heart Assocs., P.C. v. Bahamonde,* 714 N.E.2d 309, 311-12 (Ind. Ct. App. 1999); *see also* Ind. Code § 22-2-4-4 ("Every corporation, limited liability company, company, association, firm, or person who shall fail for ten (10) days after demand of payment has been made to pay employees for their labor, in conformity with the provisions of this chapter, shall be liable to such employee for the full value of his labor, to which shall be added a penalty of one dollar ($1) for each succeeding day, not exceeding double the amount of wages due, and a reasonable attorney's fee, to be recovered in a civil action and collectable without relief.").

N.E.2d 309, 311-12 (Ind. Ct. App. 1999). These cases further make clear that the right to vacation pay vests upon labor in absence of an employer policy, but if the employer has a policy, that policy governs when an employee's right vests. For example, in *Damon Corp. v. Estes*, 750 N.E.2d 891 (Ind. Ct. App. 2001), the court noted that the corporation's policy stated that "an employee does not earn vacation pay each year until his/her anniversary date" and concluded "[the plaintiff] was therefore not entitled to his vacation pay from Damon at his termination some three months prior to his anniversary date." *Id.* at 893 (citation and footnote omitted); *see also Indiana Heart Assocs.*, 714 N.E.2d at 311-12 ("An employee's right to vacation pay under the [Wage Payment Statute] is not absolute. Rather, an employee is entitled to her accrued vacation pay at the time of termination 'provided no agreement or published policy exist[s] to the contrary.'" (quoting *Die & Mold, Inc. v. Western*, 448 N.E.2d 44, 48 (Ind. Ct. App. 1983))); *id.* at 312-13 ("[I]n denying an employee accrued vacation pay *to which the employee would otherwise be entitled* on grounds that a written policy so provides, the employer has the burden of showing a violation of the policy." (emphasis added)).

Under Town of Kingsford Heights, Ind., Ordinance 2-16-020, Mr. Gazarkiewicz was not entitled to vacation pay at the time of his termination. The Ordinance explains:

> **Vacation Time:** All full-time personnel are eligible for paid vacation time according to the following schedule:
>
> One full year of continuous service      Five (5) days
>
> Three full years of continuous service   Ten (10) days
>
> Ten full years of continuous service   Fifteen (15) days
>
> The hiring date is used for determining eligibility. All vacations must be taken within the applicable

calendar year and cannot be accrued.

> If a full-time employee does not have one complete year of service completed as of January 1st of any given year, (s)he will be eligible for one paid vacation day for each ten (10) weeks of employment completed. These vacation days can be used after his/her anniversary date and must be used before the end of the applicable calendar year and cannot be accrued.

Mr. Gazarkiewicz was hired on or about May 13, 2001, and fired on November 28, 2001. Thus, at the time of his discharge, he had not performed a year of continuous service from the date of his hire nor had he worked past January 1.

Mr. Gazarkiewicz argues that this Ordinance merely purports to govern vacation *time* that an employee may take, and is silent on vacation *pay*; therefore, the background rule that an employee earns vacation pay upon his labor applies. However, a more natural reading of that Ordinance is that it is intended to cover both. Mr. Gazarkiewicz's suggested vacation time versus vacation pay distinction is illogical for the purposes for which he is advancing it: Why would an employee be eligible for vacation pay when he is not eligible for "paid vacation time"? *See Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 888 (7th Cir. 1996) (explaining that statutes should be construed so as to avoid absurd results). In sum, we hold that, at the time of his discharge, Mr. Gazarkiewicz was not entitled to vacation pay, and therefore, his state-law claim for vacation pay must fail.

## Conclusion

For the foregoing reasons, we reverse the district court's grant of summary judgment in favor of the defendants on Mr. Gazarkiewicz's First Amendment retaliation claim. The district court shall enter summary judgment in Mr. Gazarkiewicz's favor on this claim. We affirm the district court's judgment on Mr. Gazarkiewicz's state-law vacation pay claim. We remand for proceedings consistent with this opinion. Mr. Gazarkiewicz may recover his costs in this court.

AFFIRMED IN PART; REVERSED
and REMANDED IN PART

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

USCA-02-C-0072—3-8-04