# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-3888

MAHMOUD C. BASSIOUNI, also known
as CHERIF BASSIOUNI,

*Plaintiff-Appellant*,

*v.*

FEDERAL BUREAU OF INVESTIGATION,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 8918—**Joan Humphrey Lefkow**, *Judge*.

_____

ARGUED JUNE 9, 2005—DECIDED JANUARY 30, 2006

_____

Before RIPPLE, MANION and KANNE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Pursuant to the Privacy Act, 5 U.S.C. § 552a, Mahmoud Cherif Bassiouni sought to amend records maintained by the Federal Bureau of Investigation ("FBI" or the "Bureau") that pertained to his contacts with, and activities concerning, the Middle East. After exhausting his administrative remedies, Mr. Bassiouni filed this action under the Privacy Act's enforcement provisions, *id.* § 552a(g). The district court granted summary judgment to

the FBI; it held that the records were exempt from the Privacy Act's amendment requirements. Mr. Bassiouni now appeals. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. The Privacy Act—An Overview

Because this case requires an understanding of the Privacy Act, we shall depart from our usual format and set forth an analysis of its pertinent provisions before turning to the background of this case.

### 1.

#### a. general provisions

Under the Privacy Act, agencies, such as the FBI, that maintain "a system of records"[1] concerning individuals are required to do so "with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual." *Id.* § 552a(e)(5). In addition to the accuracy requirement, agencies are prohibited from maintaining certain types of information in those records, including information "describing how any individual exercises rights guaranteed by the First Amendment." *Id.*

---

[1] A system of records is defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some" other identifying characteristics. 5 U.S.C. § 552a(a)(5). The parties agree that the FBI's Central Records System is such a "system of records."

§ 552a(e)(7). The prohibition on maintaining First Amendment-related records, however, does not apply when those records are "pertinent to and within the scope of an authorized law enforcement activity." *Id.*[2] The Act does not define a "law enforcement activity," and the phrase does not appear elsewhere in the statute.

In addition to setting forth limitations on agency record keeping, the Act also contains remedial measures. The Act first provides an individual with the right to access his records upon request, *id.* § 552a(d)(1), and allows him to request amendment or correction of his records, *id.* § 552a(d)(2). In response to such a request, the agency either must amend the records or inform the individual of its reason for refusing to amend. *Id.* § 552a(d)(2)(B). An individual unsatisfied with the agency's response may pursue an administrative appeal. *Id.* § 552a(d)(3). If the internal mechanism fails to resolve the individual's request, he may seek review of the agency's decision in federal court. *See id.* § 552a(g)(1)(A)-(B).

### b. exemptions

In some cases, agencies may exempt certain record systems from Privacy Act requirements and, specifically for our purposes, the § 552a(d) amendment process. Section 552a(j), entitled "General exemptions," allows the head of an agency "to exempt any system of records within the

---

[2]  Specifically, 5 U.S.C. § 552a(e)(7) provides that an agency shall:

maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity.

agency from any part of" the Act if the system is maintained by a law enforcement agency and if the information concerns certain criminal investigation functions. *Id.* § 552a(j)(2). Under this section, however, an agency may not exempt a system of records from § 552a(e)(7), which prohibits an agency from maintaining records describing an individual's exercise of his First Amendment rights. *See id.* § 552a(j).

In addition to the general exemption provision, agencies may exempt record systems from specific sections of the Act if the records are maintained "for law enforcement purposes." *Id.* § 552a(k)(2). The amendment process of § 552a(d) is among those that may be exempted. *Id.* § 552a(k).[3] Yet, although an agency may exempt its record system from the amendment process, the agency still may not keep records of activity that is protected by the First Amendment.

### c. remedial provisions

The Privacy Act provides limited civil remedies for individuals seeking redress for an agency's noncompliance. The Act allows an individual to seek redress in federal court if an agency does not allow the individual to review his record as required by § 552a(d)(1), *see id.* § 552a(g)(1)(B), or if an agency has refused to amend a record, *see id.* § 552a(g)(1)(A).[4] An individual also may challenge an

---

[3] The FBI properly has exempted its Central Records System from § 552a(d)'s amendment process pursuant to § 552a(k). *See* 28 C.F.R. § 16.96.

[4] Both § 552a(g)(1)(A) and § 552a(g)(1)(B) refer specifically to the provisions of § 552a(d) to which they apply. Neither civil suit

(continued...)

agency's failure to maintain records with the accuracy, relevance, timeliness and completeness required by § 552a(e)(5), but only if the plaintiff demonstrates that the agency action had an "adverse" effect on him. *Id.* § 552a(g)(1)(C). Similarly, § 552a(g)(1)(D) provides a catch-all cause of action for circumstances in which an agency "fails to comply with any other provision" of the Act; however, like the relief provided in § 552a(g)(1)(C), "an adverse effect on an individual" is also a prerequisite to a § 552a(g)(1)(D) action.

**2.**

At the heart of this dispute is the interplay between § 552a(e)(7)'s protection against maintenance of records concerning First Amendment activities and that same subsection's built-in exemption for records "pertinent to and within the scope of an authorized law enforcement activity." However, the Act nowhere defines "law enforcement activity" as used in subsection (e)(7). We turn, therefore, to the Privacy Act's legislative history for further guidance in discerning the meaning of this term.

The Privacy Act's lack of precision in defining law enforcement activity may be attributed to the circumstances of its drafting and passage. The Act passed quickly in the late months of the 93rd Congress. As one commentator noted:

> Passage of the . . . Act was both aided and hindered by the Congress' focus on Watergate and the impeachment

---

[4] (...continued)
provision requires the plaintiff to show that he suffered harm as a result of the challenged agency action.

> hearings involving former President Nixon: aided, because the Watergate scandals had involved allegations of illegal wiretapping and surveillance of private citizens by federal agencies; and hindered, because the impeachment process left little time for other legislation until the closing months of the session.

Cornish F. Hitchcock, *Overview of the Privacy Act*, *in* Guidebook to the Freedom of Information and Privacy Acts 2-28 (Justin D. Franklin & Robert F. Bouchard eds., 2d ed. 2005) (hereinafter "Guidebook").

"Congress felt it was important to pass some kind of privacy protection before adjourning," *id.* at 2-27, and two bills concerning the limits of governmental intrusion into personal privacy were proposed in the Senate and in the House of Representatives, *see* S. 3418, 93d Cong. (1974), *reprinted in* Legislative History of the Privacy Act of 1974: Source Book on Privacy 9 (GPO 1976) (hereinafter "Source Book"); H.R. 16373, 93d Cong. (1974), *reprinted in* Source Book 239. Neither bill represents the final version of the Privacy Act. Indeed, due to time constraints, the bills were not reconciled through a formal conference. *See* Guidebook 2-27. Rather, members from the respective House and Senate committees "met informally and agreed on a compromise." Steven W. Becker, *Maintaining Secret Government Dossiers on the First Amendment Activities of American Citizens: The Law Enforcement Activity Exception to the Privacy Act*, 50 DePaul L. Rev. 675, 695 (2001) (citing 120 Cong. Rec. 40,400 (1974) (statement of Sen. Ervin), *reprinted in* Source Book 846).

During the compromise process, certain provisions were incorporated from both the House and Senate versions and, in some circumstances, entirely new material was added. At the close of the process, House and Senate staff members

prepared an "Analysis of House and Senate Compromise Amendments to the Federal Privacy Act." *See* Source Book at 858 (Senate); *id.* at 987 (House) (collectively hereinafter, "Staff Analysis"). This document took the place of the Conference Report, which usually represents "the most definitive record of the legislative history and intent of the law as enacted." Guidebook 2-32.

However, despite the limited legislative history, it is evident that Congress expressed particular concern with the Government's action in collecting information about citizens' exercise of their First Amendment rights. Both the Senate and the House versions of the bill contained protections to address these concerns. In the Senate bill, section 201(b)(7) provided that an agency shall "establish no program for the purpose of collecting or maintaining information describing how individuals exercise rights guaranteed by the first amendment unless the head of the agency specifically determines that such program is required . . . ." S. 3418 § 201(b)(7), *reprinted in* Source Book 130. The Senate committee report explained that section 201(b)(7)

> reflect[ed] the preferred status . . . accord[ed] to information touching areas protected by the First Amendment . . . . It [wa]s aimed at protecting Americans in the enjoyment of the privacy of their thoughts, habits, attitudes and beliefs in matters having nothing to do with the requirements of their dealings with an agency seeking information.

S. Rep. No. 93-1183, at 56 (1974), *reprinted in* Source Book 209. Moreover, the committee noted, section 201(b)(7) was "directed to the planning stage of any . . . programs being designed for the principle purpose of identifying Americans who exercise their rights under the First Amendment," and was "aimed particularly at preventing collection of protected information not immediately needed, about law-

abiding Americans, on the off-chance that Government or the particular agency might possibly have to deal with them in the future." S. Rep. No. 93-1183, at 57, *reprinted in* Source Book 210. Section (e)(4) of H.R. 16373, the House equivalent to § 201(b)(7),[5] was both broader and narrower than the Senate version; it stated simply that an agency shall "maintain no record concerning the political or religious belief or activity of any individual, unless expressly authorized by statute or by the individual about whom the record is maintained." H.R. 16373 § 552a(e)(4), *reprinted in* Source Book 285; *see* H.R. Rep. No. 93-1416, at 16, *reprinted in* Source Book 309.

After the bills were proposed in both Houses of Congress, members expressed concern that the analogues to § 552a(e)(7) were overly broad and would hamper legitimate law enforcement efforts. For example, a sponsor of H.R. 16373 assured the House that section 552a(e)(4) would not prevent the FBI from "maintaining records as to political beliefs" if the records concerned the Communist Party or other groups dedicated to the violent overthrow of the Government. *See* 120 Cong. Rec. 36,444-45, *reprinted in* Source Book 885-86.

This concern prompted Representative Ichord to propose a proviso to section 552a(e)(4), which was adopted in the final version of H.R. 16373: "*Provided, however,* That the provisions of [section 552a(e)(4)] shall not be deemed to prohibit the maintenance of any record of activity which is pertinent to and within the scope of a duly authorized law enforcement activity." *See* H.R. 16373 § 552a(e)(4), *reprinted in* Source Book 447. In introducing his amendment, Representative Ichord articulated his concerns that the broadly

---

[5] With an amendment discussed below, H.R. 16373 is the direct precursor to 5 U.S.C. § 552a(e)(7).

worded section 552a(e)(4) might allow subversive groups to use the First Amendment as a cover for illegal activities:

> [I]n its present form it is clear that [section 552a(e)(4)] can be construed to cover activities which are properly within the scope of legitimate law enforcement. I am assured that the authors of this measure have not intended the provisions to foreclose this proper purpose.
>
> The terms of the broad prohibitions on maintenance of records relating to "political" and "religious" activities would, for example, embrace the activities of the Communist Party and similar groups, which, although generally recognized as conspiratorial or clandestine, are nevertheless commonly described as "political." Similarly, certain sects within the Black Muslim movement, which have been described by the Director of the FBI as endangering the internal security, may claim protection under this clause as a "religious" activity.
>
> Although those records of political or religious activity which are "expressly authorized by statute," are excepted from the prohibitions of this paragraph, this is not adequate to exempt the activities of such subversive groups as I have indicated. I know of no existing or enforceable statute which expressly and generally authorizes any particular agency to maintain the records of political or religious activities of subversive groups. . . .
>
> I believe this clarifying amendment would obviate any ambiguities as to the reach of the prohibition, and would serve to eliminate any adverse litigation on the subject.

120 Cong. Rec. 36,650 (1974) (statement of Rep. Ichord), *reprinted in* Source Book 900-01; *see also* Guidelines for Implementing Section 552a of Title 5 of the United States

Code, 40 Fed. Reg. 28965 (1975), *reprinted in* Source Book 1074.

Representative Ichord then clarified that, "[i]n referring to a 'law enforcement activity' [as used in 5 U.S.C. § 552a(e)(7)] and 'law enforcement purposes' [as used in 5 U.S.C. § 552a(k)(2)], I am of course, using the expression 'law enforcement' in its general meaning and in the broadest reach of the term." 120 Cong. Rec. 36,651, *reprinted in* Source Book 902. He continued:

> I want to emphasize—so that there is no misunder-standing—these changes are designed to protect only legitimate national or internal security intelligence and investigations, and no records or files shall be kept on persons which are not within constitutional limitations. Let the legislative history be explicit. None of these changes are intended to abridge the exercise of first amendment rights. The rights of Americans to dissent in a lawful manner and for lawful purposes must be preserved.

*Id.*, *reprinted in* Source Book 902-03.

The provision that had been section 552a(e)(4) in H.R. 16373 emerged from the informal compromise process in its current form, 5 U.S.C. § 552a(e)(7). The final provision somewhat broadened H.R. 16373's protections, by adopting S. 3418's protection of "rights guaranteed by the First Amendment" as opposed to H.R. 16373's protection of "the political or religious belief or activity of any individual." Source Book 385. However, the compromise bill also adopted Representative Ichord's exception for "law enforce-ment activity." The only statement concerning the compro-mise section came from the congressional staff analysis, and added little toward interpreting the scope of the term "law enforcement activity":

> The compromise broadens the House provisions [sic] application to all First Amendment rights and directs the prohibition against the maintenance of records. However, as in the House bill, it does permit the maintenance, use, collection or dissemination of these records which are expressly authorized by statute or the individual subject or are pertinent to a duly authorized law enforcement activity.

*See* Staff Analysis, *reprinted in* Source Book 860.

**3.**

After reviewing the text of 5 U.S.C. § 552a and the legislative history, we believe that certain principles are clear. First, in enacting § 552a, Congress was motivated by a general concern with the potential for abuse if the Government is allowed to collect political dossiers about American citizens. Second, Congress was concerned that overly restrictive limitations on the Government's ability to collect criminal intelligence would hamper legitimate law enforcement efforts. Third, Congress' concern about restricting law enforcement was highest in areas of agency activity affecting the security of our Nation. In our decision, we must acknowledge these legislative concerns in order to give effect to the intent of Congress.

**B. Facts**

Mr. Bassiouni, a law professor at DePaul University, is a former president of the Association for Arab-American University Graduates ("AAAUG") and of the Mid-America Arab Chamber of Commerce ("AACP"). His academic work

focuses on the fields of international law and human rights, and he has extensive experience in these areas.

In a letter dated November 22, 1999, Mr. Bassiouni requested access to any records concerning himself or his activities that were in the possession of the FBI's Central Records System. On March 23, 2001, the FBI released forty-nine pages of redacted records accompanied by a transmittal sheet dated 1983. The materials consisted of several Bureau memoranda carrying dates from 1970 to 1975. One of the memoranda contained excerpts from a speech that Mr. Bassiouni had given to the AACP in 1973; it, however, did not report the full text of the speech. The records referenced a number of groups described as "terrorist," and one group, the Popular Front for the Liberation of Palestine ("PFLP"), currently is listed among the designated Foreign Terrorist Organizations by the United States Department of State. None of the record memoranda concluded that Mr. Bassiouni was a member of a terrorist organization. Mr. Bassiouni denies any such membership, and the FBI concedes that it does not suspect him of ties to terrorist groups.

On April 23, 2001, Mr. Bassiouni requested that the FBI amend his records pursuant to the Privacy Act, 5 U.S.C. § 552a. He claimed that the amendment was required because, among other things, (1) the records were inaccurate and incomplete; (2) the records described activities protected by the First Amendment; and (3) the records were outdated. On February 6, 2002, the FBI denied his request on the ground that the records were exempt from amendment under the Act because the "information is a reasonably accurate, relevant, and timely account of the results of our investigation and is completely relevant to the investigative purpose for which it was collected." R.1, Ex.C. On March 4, 2002, Mr. Bassiouni then filed an internal appeal. The FBI denied his appeal but suggested that he could

forward a "Statement of Disagreement," which would be included in the file. *Id.*, Ex.E. Mr. Bassiouni did not send a statement but instead brought this action for declaratory and injunctive relief pursuant to 5 U.S.C. § 552a(g)(1).

## C. District Court Proceedings

Mr. Bassiouni's suit alleged that the FBI maintained records on him that were untimely, were inaccurate and contained information with respect to his First Amendment activities, all in violation of the Act. *See* 5 U.S.C. § 552a(e)(5), (e)(7). In addition to costs and fees, he sought (1) expungement of the records from the Central Records System; (2) an injunction prohibiting the maintenance of such records; and (3) "such further relief as th[e District] Court deems just and proper." R.1-1 at 3.

The FBI moved to dismiss the action for failure to state a claim upon which relief could be granted. *See* Fed. R. Civ. P. 12(b)(6). It maintained that Mr. Bassiouni's suit was barred by the statute of limitations, that the Bureau's records were exempt from Mr. Bassiouni's Privacy Act claim and that Mr. Bassiouni failed to allege any adverse effect from the Bureau's maintenance of his records. The district court rejected the FBI's arguments and held that Mr. Bassiouni's complaint stated a claim for relief.

The parties later filed cross-motions for summary judgment. Mr. Bassiouni argued that he was entitled to summary judgment on both his § 552a(e)(5) and § 552a(e)(7) claims. According to Mr. Bassiouni, the file maintained by the FBI violated § 552a(e)(5) because it included references to a number of organizations, with the exception of the AAAUG, with which Mr. Bassiouni never had been associated. Not only was the inclusion of this "highly prejudicial and inflammatory" material irrelevant, continued Mr.

Bassiouni, it also was untimely because the file indicated that the FBI's investigation of him "was terminated in 1975." R.19, Memorandum of Law at 4-5. Finally, Mr. Bassiouni alleged that the file was not complete because it contained a summary, as opposed to the full text, of a speech that he had given.

Mr. Bassiouni also claimed that he was entitled to summary judgment on his § 552a(e)(7) claim because it was undisputed that his file contained information regarding his First Amendment activities. According to Mr. Bassiouni, these records did not fall within the exception for law enforcement activities set forth in § 552a(e)(7). Also, relying on this court's decision in *Becker v. Internal Revenue Service*, 34 F.3d 398 (7th Cir. 1994), Mr. Bassiouni argued that, even if the initial collection of the information contained in the file was justified, "the agency must demonstrate that its continued *maintenance* of records . . . is 'pertinent to and within the scope of an authorized law enforcement activity.'" *Id.*, Memorandum of Law at 10 (citing *Becker*, 34 F.3d at 409) (emphasis in original). Because the FBI had failed to establish a legitimate law enforcement reason for maintaining his records, Mr. Becker concluded, he was entitled to summary judgment.

The FBI filed a cross-motion for summary judgment. With respect to Mr. Bassiouni's § 552a(e)(5) claim, the FBI explained:

> The balance of Plaintiff's complaint is that he is entitled to amendment of the records pursuant to section (d)(2) because they violate the standards for accuracy established by section (e)(5). Although the Privacy Act provides a method for individuals to seek amendment of inaccurate records, 5 U.S.C. § 552a(d)(2)-(3), it also permits agencies to exempt certain systems of records from the record amendment provisions. *See* 5

> U.S.C. § 552a(j) and (k). Relying on these provisions, the FBI has promulgated regulations that specifically exempt records maintained in its Central Records System . . . from section (d)(2) to the extent that information in this system is subject to exemption pursuant to sections (j) and (k). . . . Thus the FBI is entitled to summary judgment on Plaintiff's (d)(2) claim if the records in question are (1) maintained in the [Central Records System] and (2) subject to the Privacy Act's exemption provisions.

> Both of these criteria are met here. . . .

R.22, Memorandum at 7-8.

Turning to the § 552a(e)(7) claim, the FBI argued that it was entitled to summary judgment because it had a legitimate law enforcement purpose for maintaining the file on Mr. Bassiouni. These law enforcement purposes were set forth in the Declaration of Supervisory Special Agent James Krupkowski (the "Krupkowski Declaration" or "Declaration") that was submitted with the Bureau's motion for summary judgment. The Declaration acknowledged that the agency had determined that Mr. Bassiouni was not a member of a terrorist organization. It further claimed that the exact relevance of Mr. Bassiouni's records was classified. However, the Krupkowski Declaration submitted that Mr. Bassiouni's records were relevant to current "investigative interests" because: (1) investigation of terrorism is the FBI's top priority; (2) due to his contacts, the FBI will continue to receive information about Mr. Bassiouni and will need the records to provide context with which to evaluate that new information; and (3) the records are important for evaluating the credibility and veracity of the FBI's sources. Moreover, the Declaration pointed out that, if there were a terrorist event related to one of the groups with which Mr. Bassiouni had contact, "there will be an intense interest in what the FBI knew and when it knew it. Destruction or

amendment of the records would impede such an inquiry." R.22, Ex.1 ¶ 12.

The Bureau also offered a classified version of the Krupkowski Declaration ("Classified Declaration") for the district court's in camera inspection. *See id.*, ¶ 2. The Classified Declaration purported to detail the FBI's investigative purposes. The district court, however, resolved the cross-motions for summary judgment on the information contained in the public Krupkowski Declaration alone.

In addressing the parties' arguments, the district court noted that § 552a(e)(5) and (e)(7) "do not, in themselves, give rise to a cause of action." R.36 at 7. "[I]t is the FBI's refusal to amend records under subsection (d)(3), rather than its alleged violations of (e)(5) and (e)(7), that give rise to this cause of action" pursuant to § 552a(g). *Id.* at 7-8.

The court further noted that § 552a(k)(2) allows the FBI to exempt any system of records from the subsection (d) administrative amendment process if the system of records "contains investigatory material compiled for law enforcement purposes." *Id.* at 8 (quoting 5 U.S.C. § 552a(k)(2)). Without extended discussion, the court also observed that "the same analysis applies to the FBI's alleged violations of subsection (e)(7)." *Id.* at 9, n.1. Thus, the court determined that Mr. Bassiouni could not maintain an action to amend the records if they were compiled for a law enforcement purpose, a fact established by the public Krupkowski Declaration. Consequently, Mr. Bassiouni's action for declaratory and injunctive relief failed.

In this appeal, Mr. Bassiouni challenges only the district court's grant of summary judgment on his § 552a(e)(7) claim that the FBI is illegally maintaining records concerning his First Amendment activities; he does not challenge the district court's determination with respect to his claim pursuant to § 552a(e)(5).

## II

## DISCUSSION

### A. Standard of Review

We review the district court's grant of a motion or cross-motion for summary judgment de novo. *Gazarkiewicz v. Town of Kingsford Heights, Indiana*, 359 F.3d 933, 939 (7th Cir. 2004). "In considering cross-motions for summary judgment, we are obliged to view all facts and draw all reasonable inferences in a light most favorable to the party against whom the motion under consideration is made," here Mr. Bassiouni. *Id.*

### B. Summary Judgment

As we have noted above, the central question on appeal is whether the FBI's maintenance of Mr. Bassiouni's file violates § 552a(e)(7). In addressing this issue, the parties agree that the records contained in Mr. Bassiouni's file pertain to his First Amendment activities. We shall now examine the matters on which there is disagreement.

Mr. Bassiouni presents several arguments on appeal.[6] Mr. Bassiouni submits that there is no support for the district court's holding that challenges based on § 552a(e)(7) only may be brought under § 552a(g)(1)(C) or (D), and thus require a showing of adverse effect. He also maintains that

---

[6] Mr. Bassiouni first asserts that an agency may not exclude a system of records from the requirements of § 552a(e)(7) by using its discretion under § 552a(k)(2) to exempt the records from the administrative amendment process. We agree with Mr. Bassiouni on this point. The language of § 552a(k)(2) clearly precludes an exemption for § 552a(e)(7), and further discussion on this point is not warranted.

the district court erred by not considering his request for the expungement of his records. Mr. Bassiouni finally claims that he was entitled to judgment as a matter of law because the FBI plainly is maintaining his records in violation of § 552a(e)(7).

The FBI makes one primary argument: It is entitled to summary judgment on Mr. Bassiouni's claims because its maintenance of Mr. Bassiouni's records is "pertinent to and within the scope of an authorized law enforcement activity," and therefore complies with § 552a(e)(7).

We turn now to an analysis of these submissions.[7]

---

[7] At the outset, we must resolve one issue. At oral argument, the FBI offered members of the panel access to the Classified Declaration that purported to give greater detail concerning how the matters contained in Mr. Bassiouni's file are related to a law enforcement activity. The FBI had offered to make this same declaration available to the district court; however, as set forth previously, the district court did not accept the FBI's offer, apparently in the belief that the public Krupkowski Declaration was sufficient to establish the statutory requirements. We accepted the FBI's offer, and the members of this panel viewed the Classified Declaration in camera.

After we had viewed the classified document, Mr. Bassiouni moved to bar its consideration. In his motion, Mr. Bassiouni maintains that we cannot consider the Confidential Declaration because "he did not have the opportunity to object to it at the district court level." *See* Mot. Reconsid. Ct.'s Order Dated June 10, 2005, To Review Classified Declaration at 2-3.

We ordinarily hold fast to the principle that Federal Rule of Appellate Procedure 10 was designed to ensure a complete record, not to "facilitate collateral attacks on the verdict" with documents that the district court did not consider. *See Shasteen v. Saver*, 252 F.3d 929, 935 n.2 (7th Cir. 2001). However, we do not

(continued...)

---

[7] (...continued)

believe that the evidentiary submission can be considered "ordinary" for several reasons.

Although the Classified Declaration was not made a part of the record below, both the district court and Mr. Bassiouni were made aware of its existence, and its availability as evidence, during briefing on the Bureau's motion for summary judgment. *See* R.22, Memorandum at 7 n.4. The Bureau renewed this offer in its reply brief in support of summary judgment. *See* R.35 at 9 ("Should the [district court] find that the public record is not sufficiently detailed, [it] should order an *ex parte, in camera* review of the classified Krupkowski Declaration. . . ."). The district court did not avail itself of the offer, choosing instead to rely on the public declaration. The FBI made a similar offer to this court in its appellate brief. *See* Appellee's Br. at 11, 21. Mr. Bassiouni never voiced any objection to this offer in any of his submissions to the district court, nor did he join this issue in the briefing prior to oral argument. Consequently, we do not believe that Mr. Bassiouni was deprived of the opportunity to voice his objections to the court's consideration of that document.

Mr. Bassiouni also intimates, but does not argue directly, that this court is precluded from considering the Classified Declaration because Congress has not explicitly allowed for such consideration in the language of the Privacy Act. Again, we are not persuaded by this argument. Mr. Bassiouni has not pointed to any statutory prohibition with respect to this type of submission. Additionally, implying such a prohibition would be at odds with congressional concern that the Act not impede legitimate law enforcement activities. We do not believe that Congress meant to place law enforcement agencies in the catch-22 of either divulging current investigatory activities or not asserting the law enforcement exception specifically provided in the Act.

We agree with Mr. Bassiouni that, ideally, (1) the FBI (or other law enforcement agencies) should proffer the evidence for in

(continued...)

---

[7] (...continued)

camera review to the district court, (2) the classified document should be made part of the (sealed) record, and (3) the district court should then inform the parties whether or not it relied on the classified information in rendering its decision. Such a procedure would eliminate any confusion regarding the propriety of the submission. However, we also cannot conclude that Mr. Bassiouni was prejudiced because this procedure was not followed in his case. As noted above, Mr. Bassiouni had the opportunity in the district court to raise arguments against the FBI's submission. Mr. Bassiouni does not claim that he would have had a greater right of access to the Confidential Declaration should the district court have considered it at an earlier stage in the proceedings. Indeed, in the present case, the same result would have obtained if the FBI formally had proffered the Classified Declaration for in camera review, but the court had chosen not to inspect or to rely upon the information contained therein. Consequently, Mr. Bassiouni has not suffered any injury as a result of our consideration, as opposed to the district court's consideration, of the confidential declaration.

Finally, we note that confidential declarations may play an important role in safeguarding the rights of individuals—such as Mr. Bassiouni—whose files are being maintained for law enforcement purposes. District courts need not rely on agencies' unsubstantiated assertions of a law enforcement purpose for collecting information or maintaining files; in camera review of confidential declarations provides additional evidence according to which a district court may judge the assertion of law enforcement necessity. Confidential declarations, therefore, advance the purpose of the Privacy Act by providing a necessary check on the activities of law enforcement agencies, while not jeopardizing their investigative efforts.

**1.**

Focusing on the district court's rationale for denying his § 552a(e)(7) claim, Mr. Bassiouni first argues that the Bureau may be held liable for its alleged violation of § 552a(e)(7) (and failing to cure that violation through the amendment process), pursuant to § 552a(g)(1)(A).

Mr. Bassiouni brought this action under the civil remedy provision of § 552a(g)(1)(A). By its terms, § 552a(g)(1)(A) provides a remedy only when an agency "makes a determination under [§ 552a(d)(3)] not to amend an individual's record . . . or fails to make such review in conformity with that subsection."

The FBI has exempted its Central Records System from the § 552a(d) amendment process, and those files are not subject to the amendment process of subsection (d). Because the FBI's Central Records System is not subject to the subsection (d) amendment process, the FBI cannot be held liable under (g)(1)(A) for failure to comply with that process. Mr. Bassiouni therefore has no avenue for relief under § 552a(g)(1)(A). *See Doe v. FBI*, 936 F.2d 1346, 1351-53 (D.C. Cir. 1991).

Mr. Bassiouni submits, however, that the plain language of § 552a(j) and (k) establish that Congress did not intend for an agency to exempt itself from the requirements of § 552a(e)(7). According to Mr. Bassiouni, "[t]he district court's interpretation, which leaves a plaintiff with no ability to subject the propriety of the agency's maintenance of protected First Amendment information to judicial scrutiny other than to pursue a rarely viable damage action, flies in the face of the object of the Act . . . ." Appellant's Br. at 20. In other words, according to Mr. Bassiouni, the de facto result of an agency exempting its records from subsection (d) is that it also exempts itself from the restrictions of subsection (e)(7).

We cannot accept this argument. Avenues of redress remain open to an individual whose records are maintained in violation of (e)(7), apart from those provided by the § 552a(d) amendment process and § 552a(g)(1)(A) review of that process. An individual has a cause of action under § 552a(g)(1)(D) when an agency "fails to comply with any other provisions of this section," provided that the individual demonstrates that the records' maintenance has an adverse effect on him.

Furthermore, we do not believe that requiring a plaintiff to plead an adverse effect in order to pursue a federal cause of action is tantamount to depriving the plaintiff of any remedy or is inconsistent with congressional intent. A regime in which the FBI is required to comply with (e)(7), but in which private individuals may have a remedy only when the FBI's action has an adverse effect on them, accounts for Congress' dual concerns of protecting First Amendment rights and protecting national security.

**2.**

Mr. Bassiouni also maintains that, even if he cannot proceed on the alleged (e)(7) violation by way of subsection (g), "expungement is a well-recognized remedy for violations of subsection (e)(7)." Appellant's Br. at 23. However, we need not reach the question of whether expungement is a proper remedy because, as demonstrated below, we believe that the FBI's maintenance of Mr. Bassiouni's records in this case complies with the requirements of § 552a(e)(7).

As we have noted earlier, "law enforcement activity" is not defined in the statute. Similarly, courts that have addressed the applicability of the "law enforcement activity" language of § 552a(e)(7) have not found the need to

define the term with precision. For instance, in *Patterson v. Federal Bureau of Investigation*, 893 F.2d 595, 603 (3d Cir. 1990), the court held that a defendant agency invoking the protection for law enforcement activity contained in subsection (e)(7) "must demonstrate that its records on an individual's exercise of First Amendment rights are relevant to an authorized law enforcement activity of the agency." The Sixth Circuit in *Jabara v. Webster*, 691 F.2d 272, 279-80 (6th Cir. 1982), rejected the formulation for the (e)(7) exception employed by the district court in that case: "We agree . . . that the district court's construction of the exemption in the statute, limiting it to investigation of past, present or future criminal activity, is too narrow." *Id.* at 280.

Like our sister circuits, we do not believe that the circumstances presented to us here require us to determine the precise limits of the term "law enforcement activity." In this case, the Bureau, through Special Agent Krupkowski's declaration, identifies the ways in which Mr. Bassiouni's file is related to its law enforcement activities. First, the FBI notes its ongoing investigations into the threats posed by terrorist groups, specifically those originating in the Middle East. According to the declaration, "the FBI has amended its investigative priorities, naming as its number one priority to 'protect the United States from terrorist attack.'" R.22, Ex.1 ¶ 9. Because of the nature of these investigative activities, and because of the breadth of Mr. Bassiouni's contacts with the Middle East, the FBI anticipates that it will continue to receive information about Mr. Bassiouni. *Id.*, ¶ 10. The Bureau's file on Mr. Bassiouni will provide context for evaluating that new information.

Perhaps more importantly, the public Krupkowski Declaration states that the records are important for evaluating the continued reliability of its intelligence sources. The Declaration explains that the process of verifying source

information, and therefore determining whether a source is reliable, takes place over "years, even decades." *Id.*, Ex.1 ¶11. "[S]ource information, therefore, remains relevant as long as the same source is used." *Id.*

We believe that the purposes identified by the Bureau fall within "authorized law enforcement activity" conducted by the FBI. We note at the outset that the realm of national security belongs to the executive branch, and we owe considerable deference to that branch's assessment in matters of national security. *See Center for Nat'l Sec. Studies v. United States Dep't of Justice*, 331 F.3d 918, 927-28 (D.C. Cir. 2003). Furthermore, although the Privacy Act certainly does not authorize collection and maintenance of information of private citizens on the "off-hand" chance that such information may someday be useful, it does not require law enforcement agencies to purge, on a continuous basis, properly collected information with respect to individuals that the agency has good reason to believe may be relevant on a continuing basis in the fulfillment of the agency's statutory responsibilities. The Privacy Act does not give any indication that Congress intended law enforcement agencies to begin from scratch with every investigation. Nor do we believe that Congress meant to deprive such agencies of the benefit of historical analysis.

Mr. Bassiouni, however, urges us to reject the proffered law enforcement justifications as inadequate. He maintains, first, that, in order to fall within the law enforcement exception of (e)(7) the FBI must be "*currently* involved in a law enforcement investigation of Plaintiff." Appellant's Br. at 31 (emphasis in original). However, as we have noted already, no court that has considered the meaning of law enforcement activity in (e)(7) has interpreted the term so narrowly. Indeed, this court suggested in *Becker* a broader conception of "law enforcement activity" than that proposed by Mr. Bassiouni. *See* 34 F.3d at 408 (acknowledging

that, "[u]nder some circumstances, [future use] may be a legitimate justification for maintaining documents in a file for an extended period of time"). Furthermore, if Congress had meant law enforcement activity only to mean "current law enforcement investigation," we believe Congress would have chosen more restrictive language. It certainly did so with respect to other subsections of the Privacy Act. *See, e.g.*, 5 U.S.C. § 552a(j)(2) (speaking of "information compiled for the purpose of a criminal investigation"). We believe that Congress anticipated that, in the fulfillment of its responsibilities, an agency must maintain information that it can reasonably demonstrate will be pertinent in its efforts to evaluate the significance of future situations.

Mr. Bassiouni additionally submits that, even if the materials in his file are relevant to some law enforcement purpose, they should not be maintained in a file identifying him by name, but, instead, in a general file. He believes that our decision in *Becker*, 34 F.3d at 409, endorses this distinction. We do not believe that *Becker* supports Mr. Bassiouni's contention. In *Becker*, this court examined the material contained in the Beckers' file, which "consist[ed] of newspaper articles dating from the middle to late 1980s, *with no reference* to the Beckers." *Id.* (emphasis added). Furthermore, although the IRS asserted that it may maintain the materials "for possible future uses," it did not "elaborate on how this material would be helpful." *Id.* Here, by contrast, the materials contained in Mr. Bassiouni's file actually refer to Mr. Bassiouni and recount his activities. Additionally, the FBI has articulated a law enforcement purpose for maintaining the material in a file that identifies Mr. Bassiouni by name. Thus, we do not believe that *Becker* supports the position urged by Mr. Bassiouni.

As noted above, the Privacy Act was designed to protect citizens from Government intrusion. However, language

specifically was added to the Act to ensure that it did not stifle "activities which are properly within the scope of legitimate law enforcement." 120 Cong. Rec. 36,650 (1974) (statement of Rep. Ichord). The purposes for maintaining Mr. Bassiouni's file articulated by the FBI are properly within the scope of its law enforcement activity. Consequently, we do not believe that the FBI has run afoul of subsection (e)(7) by maintaining Mr. Bassiouni's file.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

     Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*